**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEATHER MARIE EWING; MARK LEE
EWING; KATELYN JOYNER EWING-
MUNNERLYN, a minor by and
through her father Mark Lee
Ewing; RACHEL MARIE EWING, a
minor by and through her parents
Heather Marie Ewing and Mark
Lee Ewing; SAVANNAH JAILYN
EWING, a minor by and through
her parents Heather Marie Ewing
and Mark Lee Ewing,
    *Plaintiffs-Appellants,*

    v.

CITY OF STOCKTON; JOHN D.
PHILLIPS, District Attorney; LESTER
F. FLEMING, Deputy District
Attorney; WILLIAM JEROME HUTTO,
individually and in his capacity as
a City of Stockton Police Officer;
STEVEN MCCARTHY, individually
and in his capacity as a City of
Stockton Police Officer; JOHN J.
REYES, individually and in his
capacity as a City of Stockton
Police Officer,
    *Defendants-Appellees,*

    and

16209

STATE OF CALIFORNIA; COUNTY OF
SAN JOAQUIN,

                    *Defendants.*

No. 08-15732

D.C. No.
2:05-CV-02270-
WBS-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted
October 6, 2009—San Francisco, California

Filed December 9, 2009

Before: Pamela Ann Rymer and A. Wallace Tashima,
Circuit Judges, and Lynn S. Adelman,* District Judge.

Opinion by Judge Adelman

---

  *The Honorable Lynn S. Adelman, United States District Judge for the

Eastern District of Wisconsin, sitting by designation.

## COUNSEL

Terry Gross, San Francisco, California, for the plaintiffs-appellants.

Shelley L. Green, Deputy City Attorney; Jason R. Morrish, Deputy County Counsel, Stockton, California, for the defendants-appellees.

## OPINION

ADELMAN, U.S. District Judge:

*DECISION*

Plaintiffs-Appellants Mark and Heather Ewing and their minor children (collectively "the Ewings")[1] filed a § 1983 action against the City of Stockton, California; Stockton police officers John Reyes, William Hutto and Steven McCarty (collectively "the officers" or the "officer-defendants"), and District Attorney John D. Phillips and Deputy District Attorney Lester Fleming, Jr. (collectively "the

---

[1]We will sometimes refer to the Ewings by their first names.

DAs" or the "DA-defendants"), alleging violations of their constitutional rights arising out of the search of their home and the arrest of Mark and Heather in connection with a murder that they did not commit.[2] The district court granted summary judgment to defendants on most of the Ewings' claims, and the parties stipulated to the entry of judgment on such claims under Fed. R. Civ. P. 54(b), permitting this appeal.

## I.  BACKGROUND

On the night of November 5, 2004, a fight broke out in the parking lot of Shaker's Bar in Stockton between men who had been drinking at the bar and two men wearing "Jus' Brothers" motorcycle club vests. Mark Donahue and several friends watched the fight. A woman bumped into or pushed Donahue, and Donahue yelled at her. The woman called out for help, and one of the men in vests struck Donahue with a Mag-lite flashlight and stabbed him, resulting in his death. The two men in vests left on motorcycles, with the woman on the back of one of them.

Stockton police officers Reyes and Hutto responded and took statements from witnesses, including Donahue's friends, Brian Shirk and Richard Contreras. Shirk stated that the woman was "in her mid-thirties" and that he had "never seen these three people before but could definitely identify them if he saw them." The next day, Shirk telephoned Reyes, stating that he had viewed photographs on the Jus' Brothers website and recognized the woman. He then met with Reyes and provided him with three website photos of the woman and later a recorded statement. A district attorney's investigator identified the woman as Heather Ewing, wife of Jus' Brothers Vice President Mark Ewing. Soon after, Reyes and Hutto sought a search warrant for the Ewings' residence.

---

[2]The Ewings also asserted state law claims, which are not presently at issue.

In his affidavit supporting the request for a warrant, Hutto included reports of Shirk's on-the-scene statement and of his subsequent identification of Heather. He stated incorrectly that Heather had recently been arrested for domestic violence, basing this statement on a file pertaining to a Nicolette Marie Ewing rather than Heather Marie Ewing. He also included a summary of Shirk's November 7, 2004 recorded statement to Reyes and represented Shirk as having said, "I don't remember what the name was that the female called out, but the name ended with the letter 'K'." However, Shirk actually said that it "may, might have had like, uh, uh K type of sound at the end of it, like a Mike or Jack."

Hutto concluded the affidavit as follows:

> Based on my training and experience, as well as the above facts, I believe Heather Marie Ewing and possibly her husband Mark Lee Ewing may have been involved in the homicide that occurred at 2130 Country Club Blvd on Friday (November 5, 2004). I also believe there is evidence related to the crime of homicide located at 405 S. Carroll Ave, Stockton, California [i.e., the Ewing residence].

A state court issued a search warrant, authorizing the officers to seize (1) indicia tending to establish the identity of the persons in control of the premises; (2) items of clothing worn by the murder suspect, including a Jus' Brothers vest or jacket; (3) weapons used to commit the murder, including any knives, flashlights or tools matching those used in the crime; (4) trace evidence, including hair, blood, fibers or finger prints of the suspect; (5) narcotics or narcotic paraphernalia; (6) written names or monikers on walls, furniture, items or papers, or any photos, scrapbooks, letters or other documents depicting fellow gang members or associates; and (7) electronic storage and computer equipment.

Police executed the warrant at about 7:00 a.m. on November 8. After securing the residence, police discovered a hand-

gun, knives, marijuana, a Mag-lite flashlight, a motorcycle and indicia of the Jus' Brothers motorcycle club. Heather was present, and the officers arrested her for possession of the drugs and gun. Mark had previously left the residence in a truck listed in the search warrant, and the police stopped and arrested him as well, apparently on drug and weapon charges.

Later on November 8, the officers showed photos to five witnesses from Shaker's Bar, three of whom identified Heather as the female who summoned the biker who killed Donahue. One witness provided a tentative (fifty to sixty percent) identification of Mark. Reyes testified that he contacted Fleming who advised him to "add-book" murder charges.[3] Because of the murder charges, Heather and Mark could not obtain bail.

Between November 8 and 10, a number of witnesses provided information to Reyes and Hutto that cast doubt on Mark and Heather's involvement in the murder. The bartender at Shaker's stated that Mark was not present on the evening of the murder, and several anonymous callers said that the police had arrested the wrong people and that the assailant was a man named Frankie.

On November 10, Reyes and Hutto met with Fleming and Deputy District Attorney Mayo and shared their concerns about the Ewings' involvement. Fleming nevertheless filed a complaint charging Mark and Heather with murder. On November 12, Frank Prater and Robert Memory turned themselves in, in connection with the Donahue murder. On November 15, the police released Mark and Heather and dropped the murder charges against them.[4]

---

[3]Fleming testified that he could not recall the conversation.

[4]Mark subsequently pleaded no contest to possession of marijuana.

## II. STANDARD OF REVIEW

[1] We review a district court's grant of summary judgment de novo. *E.g.*, *Conn v. City of Reno*, 572 F.3d 1047, 1054 (9th Cir. 2009) (citing *McDonald v. Sun Oil Co.*, 548 F.3d 774, 778 (9th Cir. 2008)). On such review, taking the evidence in the light most favorable to the non-moving party, we determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Friedman v. Boucher*, 568 F.3d 1119, 1124 (9th Cir. 2009), *amended*, 580 F.3d 847 (9th Cir. 2009). In order to survive a motion for summary judgment on a § 1983 claim, the plaintiff must establish a genuine issue of material fact that the defendant (1) acted under the color of state law, and (2) deprived him of a constitutional right. *See, e.g.*, *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008).

## III. DISCUSSION

The Ewings raise the following issues: (1) whether the search warrant was supported by probable cause; (2) whether it was sufficiently particular, and if not, whether its overbroad portions were severable;[5] (3) whether officers unlawfully arrested Mark and Heather for murder; (4) whether they wrongfully detained Mark and Heather after being made aware of evidence tending to exonerate them; and (5) whether the DA-defendants are entitled to absolute immunity. We affirm the district court's rulings on the first four but reverse and remand on the fifth.

### A. Probable Cause for Issuance of Search Warrant

[2] We review the issuance of a search warrant deferentially, upholding it if the issuing judge "had a 'substantial

---

[5]The Ewings also challenge Heather's arrest on drug and gun charges, but such claim is based solely on the alleged invalidity of the search warrant pursuant to which officers seized the contraband.

basis' for concluding [that] probable cause existed based on the totality of circumstances." *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994) (quoting *United States v. Bertrand*, 926 F.2d 838 (9th Cir. 1991)).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *see also United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002) ("Probable cause requires only a fair probability or substantial chance of criminal activity[.]"). Thus, a judge's "determination that an affidavit provided probable cause to issue a search warrant will be upheld unless clearly erroneous." *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004).

**[3]** The Ewings contend that the police procured the warrant through deception. To prevail on such a claim, they "must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)); *see also Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) ("A plaintiff must make (1) a substantial showing of deliberate falsehood or reckless disregard for the truth, and (2) establish that but for the dishonesty, the challenged action would not have occurred. If a plaintiff satisfies these requirements, the matter should go to trial.") (internal quotation marks omitted). "Omissions or mis-

statements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978). Nor may a claim of judicial deception be based on an officer's erroneous assumptions about the evidence he has received. *Id.* at 739-40.

**[4]** If a party makes a substantial showing of deception, the court must determine the materiality of the allegedly false statements or omissions. *KRL*, 384 F.3d at 1117; *see also Butler*, 281 F.3d at 1024 ("Materiality is for the court, state of mind is for the jury."). If an officer submitted false statements, the court purges those statements and determines whether what is left justifies issuance of the warrant. *See, e.g.*, *Baldwin v. Placer County*, 418 F.3d 966, 971 (9th Cir. 2005). If the officer omitted facts required to prevent technically true statements in the affidavit from being misleading, the court determines whether the affidavit, once corrected and supplemented, establishes probable cause. *See, e.g.*, *Liston v. County of Riverside*, 120 F.3d 965, 973-74 (9th Cir. 1997).

**[5]** The district court analyzed the Hutto affidavit and concluded that a reasonable jury could find that it contained two deceptive representations: (1) that Heather had an arrest record, and (2) that Shirk said that the female biker called for help from a biker whose name ended with the letter K. The officers do not contest these conclusions, and we agree with them. Thus, we must determine whether the district court correctly concluded that the balance of the affidavit, consisting mainly of Shirk's description of the incident and his identification of Heather, was sufficient to establish probable cause.

**[6]** We agree with the district court. Neither of the problematic representations was critical to the probable cause determination. The misstatement that Heather had recently been arrested for domestic violence contributed nothing to the judge's finding of probable cause. Hutto did not, for example, misstate the record of a critical informant, *see, e.g.*, *United*

*States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997), or of a suspect where the suspect's record was an element of the offense under investigation, e.g., a felon in possession charge.

Hutto likely included the representation that Shirk said that the female biker called out a name ending in the letter K to bolster the proposition that the female biker, believed to be Heather, called out for her husband Mark.[6] But Shirk *did* state that the name may have ended in a K sound; thus, in this instance, the affidavit contained an exaggeration rather than a fabrication, and omission of the qualifier "may" was highly unlikely to have substantially impacted the issuing judge's decision. Further, Hutto's affidavit primarily focused on Heather and contained ample evidence that she was the female in question and that relevant evidence might reasonably be found in her home.

**[7]** Shirk's identification of Heather constituted the key part of the affidavit, and it was sufficiently reliable. First, Shirk was a citizen witness, not an informant, and such witnesses are generally presumed reliable. *See United States v. Banks*, 539 F.2d 14, 17 (9th Cir. 1976) ("A detailed eyewitness report of a crime is self-corroborating; it supplies its own indicia of reliability."); *see also United States v. Blount*, 123 F.3d 831, 835 (5th Cir. 1997) (noting that "citizen informants, identified bystanders, victims and crime scene witnesses may generally be presumed credible by police in a way that professional informants are not") (internal quotation marks omitted); 2 Wayne R. LaFave, *Search and Seizure* § 3.4(a) (4th ed. 2004) (noting that corroboration is generally not essential when an average citizen reports a crime based on personal observations, and that in such cases reliability may generally be presumed).[7]

---

[6] It appears that the female actually called out for Frank, i.e., Frank Prater.

[7] In *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991), we declined to adopt the "argument that merely because citizen witnesses are

Second, the judge could reasonably find the information Shirk provided reliable under the circumstances. Indicia of reliability include:

> 1) the opportunity to view the criminal at the time of the crime; 2) the degree of attention paid to the criminal; 3) the accuracy of the prior descriptions of the criminal; 4) the level of certainty demonstrated at the time of confrontation; and 5) [ ] the length of time between the crime and the confrontation.

*Grant v. City of Long Beach*, 315 F.3d 1081, 1087 (9th Cir. 2002), *amended*, 334 F.3d 795 (9th Cir. 2002).[8] Shirk's contemporaneous statement was that he was standing next to Donahue when the female pushed him. The next day, when events presumably remained fresh in his mind, Shirk viewed photos on the Jus' Brothers web site and "immediately recognized" the female. The DA's investigator identified the female as Heather Ewing, wife of Jus' Brothers member Mark Ewing. The next day, Shirk provided a more detailed statement, which included descriptions of all three bikers.[9]

---

presumptively reliable, the officers in this situation had no duty to examine further the basis of the witness' knowledge or talk with any other witnesses." However, in the present case, the officers spoke with multiple witnesses, received the photos upon which Shirk based his identification, and reviewed their findings with a district attorney's investigator familiar with the Jus' Brothers.

[8]In determining whether an affidavit establishes probable cause for the issuance of a search warrant, the court limits its review to the data contained within the four corners of the affidavit. *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc). In the present case, the parties discuss much evidence outside the four corners of Hutto's affidavit. Some of this evidence may be relevant to appellants' arguments regarding omissions from the affidavit, but it may not be considered in evaluating the warrant itself.

[9]The Ewings argue that Shirk's description of the woman was influenced by his viewing of the website photos. In his initial statement he described the woman as being in her mid-30's; only after viewing the

**[8]** Third, the affidavit provided a substantial basis for concluding that there was a fair probability that police would discover evidence relating to the Donahue murder in the Ewing home. Multiple witnesses stated that two men wearing Jus' Brothers vests participated in the fight. Shirk identified Heather as the female who rode off with one of the bikers. The DA Investigator stated that Heather was married to Mark, a Jus' Brothers member. Based on this evidence, the issuing judge reasonably concluded that the police might find evidence relating to the homicide in the Ewing home. The Ewings argue that the affidavit did not establish that the Ewings committed the murder. However, it did not have to. It needed only to establish probable cause for the search. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978) ("Under existing law, valid warrants may be issued to search *any* property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found.").

The Ewings contend that the officers omitted other information casting doubt on Shirk's identification of Heather. But "[t]he government need not include all of the information in its possession to obtain a search warrant . . . . The omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt on the existence of probable cause.' "

---

website did he provide details. But the issuing judge was aware of these facts, which do not undercut probable cause. Citing *Simmons v. United States*, 390 U.S. 377 (1968), the Ewings complain that Shirk viewed the website under suggestive circumstances, but we cannot fault the police for the manner in which Shirk, on his own, investigated the case. Further, the record suggests that Shirk did not identify Heather arbitrarily. He advised Reyes that he looked through various photos before he spotted the female biker, and he did not identify either of the male bikers from the website photos. Thus, based on the what they knew at the time, the police had no reason to doubt Shirk. The Ewings fault the officers for not exploring with Shirk the fact that other women depicted on the website looked like Heather. But in analyzing a judicial deception claim, we need not scrutinize police investigative tactics in this fashion.

*United States v. Johns*, 948 F.2d 599, 606-07 (9th Cir. 1991) (quoting *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980)); *see also United States v. Streich*, 759 F.2d 579, 586 (7th Cir. 1985) (noting that *Illinois v. Gates* does not require officers to apprise a judicial officer of everything); *United States v. Luciano*, 785 F. Supp. 878, 881 (D. Mont. 1991) ("Certainly, an investigating officer cannot be expected to include the sum total of all of his investigation in the affidavit supporting a search warrant."). None of the details appellants cite cast doubt on the existence of probable cause.[10]

The Ewings first assert that the officers should have advised the judge that Shirk only briefly viewed the female and that a helmet covered most of her face. But Shirk told the officers "I looked right at her, that's how I got a good look at her."[11] Shirk stated that the female wore a full face helmet, but he did not say that it covered her face. Further, the officers disclosed that the female wore a "full face helmet" in the affidavit. Thus, this information does not undermine Shirk's identification or the judge's issuance of the warrant.

The Ewings next note that after viewing various DMV photos, including those of Mark and Heather, Contreras and Rajala initially made no identifications. However, the officers

---

[10]As discussed above, the materiality of an omission is an issue for the court.

[11]The Ewings quote Shirk's testimony from Prater and Memory's trial, but the officers obviously did not have this information at the time they prepared the warrant affidavit. The Ewings also fault the officers for not asking Shirk more questions, such as whether he had been drinking, how long he looked at the female, whether her helmet face shield was up or down, and what the lighting conditions were. But judicial deception claims do not require an inquiry into the quality of the police investigation. *See generally Gates*, 462 U.S. at 235-36 (recognizing that because affidavits are typically drafted in the midst and haste of a criminal investigation, by non-lawyers, they must be read with an understanding of that context and accordingly held to a lower standard of scrutiny than that applied to pleadings filed in more formal proceedings).

included Rajala's statement in the affidavit. They did not include Contreras's non-identification,[12] but given the strength of Shirk's identification, this omission does not cast doubt on probable cause. *See United States v. Colkley*, 899 F.2d 297, 302 (4th Cir. 1990) (holding that omission of non-identification from photo spread was not material, and that the Fourth Amendment does not require an affiant to include all potentially exculpatory evidence in the affidavit).

[9] The Ewings also complain that prior to applying for the warrant, the officers did not show photos to the bartender, Jamie Whipp, or, after obtaining Shirk's identification, seek corroboration from Whipp or Contreras. But these are not the type of omissions with which *Franks*[13] and its progeny are concerned. Once he has probable cause, an officer is not ordinarily required to continue to investigate or seek further corroboration. *See, e.g.*, *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) ("An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation, but once an officer has established probable cause, he may end his investigation.") (citing *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023-24 (9th Cir. 2009)); *McKinney v. Richland County Sheriff's Dep't*, 431 F.3d 415, 418-19 (4th Cir. 2005) ("The fact that [the officer] did not conduct a more thorough investigation before seeking the arrest warrant does not negate the probable cause established by the victim's identification."); *Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998) ("The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation."). Application of this principle seems particularly appropriate in the present situation, where evidence, unless promptly seized, could have disappeared and where the officers were particularly inter-

---

[12]After the Ewings' arrest, Contreras did identify Heather as the female biker from a photo spread.

[13]*See Franks v. Delaware*, 438 U.S. 154 (1978).

ested in seizing weapons used in a crime, as well as trace evidence such as hair, blood or fibers.[14]

The Ewings further argue that Shirk's description of the woman differed from that of other witnesses. But only a few of the twenty-one witnesses interviewed at the scene mentioned the woman, and the Ewings do not point to any significant differences. Only Contreras provided a detailed description, stating that the woman was possibly in her late 30's, about 5'10" tall, 120-135 pounds, blond hair, wearing a black helmet and dark clothing. Shirk subsequently described the woman as late 20's to mid-30's, about 5'6" or 5'7", weighing 120-130 pounds, blond hair, wearing dark clothing and a black helmet. Aside from Shirk's statement that the woman wore glasses, the two descriptions are quite similar. Omission of this information did not mislead the judge.

The Ewings next argue that the officers misrepresented that the female biker enticed or otherwise instigated the confrontation with Donahue. But the portion of the affidavit containing this statement consists of a near verbatim quote from the police report of the on-the-scene interview with Shirk. The Ewings do not argue that the officers falsified this statement; rather, they argue that Shirk's later, more detailed statement indicates that the statement was inaccurate. But the officers included a paraphrased version of the later statement in the affidavit, which accurately relates Shirk's contention that the female started the confrontation by pushing Donahue. The Ewings fault the officers for not including Shirk's statements that the female "looked completely harmless" and was "trying to keep out of the way", and that he didn't "think she meant anything by what she did." The Ewings also note that Contr-

---

[14]It is also worth noting that on November 8, after the officers had arrested Heather and Mark on gun and drug charges but before adding the murder charge, they *did* present photo spreads to five witnesses, including Whipp and Contreras, both of whom identified Heather as the female biker.

eras stated in his interview that the female appeared to be trying to get away from the fight. But however the confrontation started, whether the female biker instigated it or was simply trying to get away, it is undisputed that she pushed or jogged Donahue hard, that he yelled at her, that she then called to one of the bikers who immediately attacked Donahue and killed him, and that she then fled the scene with the bikers. These facts indicate that the judge reasonably concluded that the officers might find evidence of the crime at the female's home.[15]

Finally, the Ewings attack the district court's statement that there was reasonable suspicion that Mark was involved. However, this statement is irrelevant. The question was whether there was probable cause to search the Ewings' house, not to arrest Mark.[16]

## B. Particularity of Warrant

[10] A warrant must particularly describe "the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. This requirement is designed "to prevent 'a general, exploratory rummaging in a person's belongings.' " *United States v. McClintock*, 748 F.2d 1278, 1282 (9th Cir. 1984) (quoting *Andresen v. Maryland*, 427 U.S. 463, 480

---

[15]The Ewings correctly note that the affidavit contains only Shirk's description of the female's activity. Thus, the district court should not have referred to a "myriad of witness testimony." Nor should it have stated that Heather's vital statistics matched those recounted by others. No others recounted any statistics.

[16]The officers argue that they are entitled to qualified immunity in connection with the search warrant. However, qualified immunity is generally unavailable in a judicial deception case. *See Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991) (stating that "if an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, . . . he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost") (internal quotation marks omitted), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

(1976)). However, "a search warrant need only be reasonably specific, rather than elaborately detailed," and "the specificity required [ ] depend[s] on the circumstances of the case and the type of items involved." *United States v. Brobst*, 558 F.3d 982, 993 (9th Cir. 2009) (internal quotation marks omitted). Relevant factors are:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*United States v. Lacy*, 119 F.3d 742, 746 n.7 (9th Cir. 1997).

[11] The district court found ¶¶ 5 and 7 of the warrant, pertaining to narcotics and computer equipment, overbroad, and it severed the overbroad portions. The Ewings contend that the district court should not have employed severance and that other portions of the warrant are also overbroad. The Ewings' argument regarding the propriety of severance consists of two sentences and is based solely on the district court's failure to cite a Ninth Circuit case supporting application of the doctrine of partial suppression in the civil context. However, the Ewings offer no reason why the doctrine should not apply. We have "endorsed a doctrine of severance" in the criminal context, *e.g.*, *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 707 (9th Cir. 2009); *see also United States v. Sells*, 463 F.3d 1148, 1150 n.1 (10th Cir. 2006) (noting that all federal circuits apply the doctrine), and see no reason not to apply it in civil cases. As the court stated in *Naugle v. Witney*, 755 F. Supp. 1504, 1517 (D. Utah 1990):

> It would seem highly anomalous for this court to allow the admission of evidence obtained pursuant to

> the valid portion of this Warrant in a criminal trial while holding defendants civilly liable for the search and seizure of that same evidence.
>
> The fourth amendment is not applied with zero-sum force in the criminal context, and the court knows no compelling policy reasons why it should be so applied in the civil context. Deterrence of police conduct violative of the fourth amendment, the prime justification for the exclusionary rule, is not undermined by the severance doctrine because evidence seized pursuant to the invalid part of the warrant still is excluded. Similarly, in the civil context, police overreaching is deterred by the liability that may be imposed for that portion of the search conducted pursuant to the unconstitutional part of the warrant.

Turning to the Ewings' second argument, they contend first that ¶ 1, regarding "Indicia tending to establish the identity of persons in control of the premises," is overbroad. However, this court has long upheld warrants containing such language. *See, e.g.*, *United States v. Alexander*, 761 F.2d 1294, 1302 (9th Cir. 1985) (collecting cases). The Ewings argue that such cases typically involve situations where the premises in question are used to commit crimes. *See, e.g.*, *United States v. Whitten*, 706 F.2d 1000, 1009-10 (9th Cir. 1983), *implied overruling on other grounds recognized by United States v. Rodriguez-Rodriguez*, 441 F.3d 767 (9th Cir. 2006). But the Ewings cite no authority limiting the language to such cases.[17] Further, in the present case, where the female biker — reasonably believed to be Heather — left the scene of the crime with

---

[17]The Ewings cite *Whitten*, in which the court expressed concern about a general search of an individual's papers and effects. 706 F.2d at 1010. But the cited portion of the opinion addressed the *execution* of the search, not the warrant itself (which contained similar indicia of control language, and which the court upheld).

two males, it was reasonable for the officers to seek such evidence.

The same is true of the Ewings' challenge to ¶ 6, pertaining to gang material; the officers had information that two Jus' Brothers members were involved in the fight outside Shaker's Bar, that one of them killed Donahue, and that Heather was his companion. Thus, it was reasonable for the officers to seek information that might enable them to identify the two gang members. The Ewings argue that no evidence indicated that Heather belonged to the gang; however, whether or not she was a formal member, Shirk found her photo on the Jus' Brothers website.

The Ewings also argue that ¶¶ 2-4 are overbroad, but this challenge is particularly weak. In ¶ 2, the judge authorized a search for items of clothing worn by the suspect, including Jus' Brothers jackets or vests; in ¶ 3 for weapons the suspect may have used, including knives, flashlights or tools, matching given descriptions; and in ¶ 4 for trace evidence, including hair, blood, natural fibers or latent fingerprints that the suspect may have left. The Ewings complain that the warrant was not limited according to the witnesses' specific descriptions. But the witnesses did not provide precise descriptions of the clothing or weapons in question, making greater specificity impracticable. The Ewings assert that ¶ 4 does not identify the suspect, but evidence making such identification possible is what the officers hoped to find.

**[12]** Thus, for the reasons stated, ¶¶ 1-4 and 6 of the warrant are sufficiently particular, making application of the severance doctrine appropriate. *See United States v. Sears*, 411 F.3d 1124, 1130 (9th Cir. 2005).[18]

---

[18]Because the Ewings' overbreadth claim fails, so too does their claim that the officers unlawfully arrested Heather on drug and gun charges, which claim is predicated on the invalidity of the warrant.

## C.   Arrest of Mark and Heather for Murder

**[13]** " 'Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested.' " *Torres v. City of L.A.*, 548 F.3d 1197, 1206 (9th Cir. 2008) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)), *cert. denied*, 129 S. Ct. 1995 (2009). As we noted in *Torres*, which also involved an arrest for murder, "the proper inquiry is whether the detectives had probable cause to believe that [the plaintiff] had committed a crime," not merely that he or she was present at the scene or accompanied the responsible parties. *Id.*

In California, murder is unlawful killing with malice aforethought. *See* Cal. Penal Code § 187. An aider or abettor is one who " 'acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " *Juan H. v. Allen*, 408 F.3d 1262, 1276 (9th Cir. 2005) (quoting *People v. Beeman*, 674 P.2d 1318, 1326 (Cal. 1984)). California also recognizes "a provocative act murder theory," which "can be applied in 'situations in which criminal defendants neither kill nor intend to kill, but cause a third party to kill in response to their life-threatening provocative acts.' " *Torres*, 548 F.3d at 1207 n.8 (quoting *People v. Cervantes*, 29 P.3d 225, 230 (Cal. 2001)).

As indicated above, the police had arrested Mark and Heather on drug and weapon charges when they add-booked the murder charge. Although the officers had discretion to add murder charges on their own, following typical practice, Reyes contacted the district attorney's office to obtain advice and spoke to Fleming. Reyes advised Fleming that three witnesses had identified Heather as the female biker and that the police had discovered knives, a Mag-lite flashlight and Jus'

Brothers clothing in her house. He also advised Fleming that one witness had made a weak identification of Mark. Fleming advised Reyes to add-book a murder charge. As a result, Mark and Heather were denied bail, prolonging their detention.[19]

The district court found that Heather's arrest for aiding and abetting murder was supported by probable cause but questioned the legitimacy of Mark's. However, it determined that the officers were entitled to qualified immunity in connection with Mark's arrest because they relied on Fleming's legal advice. We find that as to both arrests, the officers are entitled to qualified immunity. As to its conclusion that Heather's arrest was supported by probable cause, the district court cited no California cases. Moreover, the evidence supporting its conclusion was slim. Limited evidence supported the notion that the female biker instigated a confrontation with Donahue (as opposed to bumping into him while trying to avoid the fracas) or that she intended to or did anything to encourage or facilitate the attack on Donahue. *See People v. Richardson*, 183 P.3d 1146, 1189 (Cal. 2008) (stating that "mere presence at the scene of a crime . . . [is] [in]sufficient to establish aiding and abetting") (internal quotation marks omitted), *cert. denied*, 129 S. Ct. 1316 (2009). The fact that the female biker left the scene with the biker and was later in possession of items that may have been connected to the offense does not support a charge of aiding and abetting murder. No one contends that Heather was an accessory after the fact.

**[14]** In any case, we need not determine whether the officers had probable cause to arrest Heather for murder because the officers are entitled to qualified immunity. *See Pearson v.*

---

[19]As the Seventh Circuit noted in *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007), "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." However, the parties agree that in the present case, the arrest for murder was significant because it caused Mark and Heather's continued detention.

*Callahan*, 129 S. Ct. 808, 818 (2009) (authorizing courts to determine whether right at issue was clearly established before deciding whether it was violated). The Ewings do not establish that the unlawfulness of charging Heather with murder on the facts in question was clearly established. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (stating unlawfulness must be apparent based on pre-existing law). Further, the officers were entitled to rely on the legal advice they obtained from Fleming.[20] Many courts, including this one, have endorsed such consultation, *see, e.g.*, *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004) (citing *Arnsberg v. United States*, 757 F.2d 971, 981 (9th Cir. 1985)), and while it will not automatically insulate an officer from liability, "it goes far to establish qualified immunity." *Id.*; *see also Frye v. Kansas City Mo. Police Dep't*, 375 F.3d 785, 792 (8th Cir. 2004) ("Although following an attorney's advice does not automatically cloak [officers] with qualified immunity, it can show the reasonableness of the action taken.") (internal quotation marks omitted).

The officers are similarly entitled to qualified immunity with respect to their arrest of Mark. As the district court noted, the evidence against Mark was slim. One witness made a tentative identification. The officers did, however, have some circumstantial evidence, including the Mag-lite, knives and Jus' Brothers paraphernalia found in the Ewing home. They also had Shirk's statement that the woman called out to a man whose name may have ended in a K. Most significantly, however, they had Fleming's recommendation to add a murder charge. As stated, an officer's consultation with a prosecutor is not conclusive on the issue of qualified immunity. *See, e.g.*, *Dixon v. Wallowa County*, 336 F.3d 1013, 1019 (9th Cir. 2003); *Stevens v. Rose*, 298 F.3d 880, 884 (9th

---

[20]Reyes expressed doubt as to the existence of probable cause, but his subjective beliefs are irrelevant; the standard is objective. *Lopez*, 482 F.3d at 1072.

Cir. 2002). However, it is evidence of good faith, and in the present case, it tips the scale in favor of qualified immunity.

## D.   Continued Detention of Mark and Heather

**[15]** As we explained in *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005):

> A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated. "As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986) (citation omitted) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.").

However, once a prosecutor has filed charges, the arresting officers will generally be found immune. *See Smiddy v. Varney*, 665 F.2d 261, 266-67 (9th Cir. 1981).

Between November 8, when the officers arrested Heather and Mark for murder, and November 10, when the district attorney filed a formal complaint, the officers received information suggesting that they had the wrong people. On November 9, the bartender, Whipp, identified a man named "Rob" from a Jus' Brothers group photo as one of the bikers involved and stated she did not recognize Mark, whose picture she had seen in the morning paper.[21] On November 10, she identified Robert Memory from a photo lineup, and on the same day, anonymous callers identified the assailant as Frankie. Reyes was aware of Whipp's statements and of the calls

---

[21]Whipp *did* identify Heather from a photo spread.

identifying Frankie, and he also knew that on November 8, an anonymous tipster called the Stockton crime-stoppers, stating that "the guy who killed the kid at Shaker's is a JUS BROTHER and his name is Frankie."

**[16]** We agree with the district court that the officers are entitled to qualified immunity in connection with their decision not to release Mark and Heather. Whether or not the officers knew Frankie's last name, which is disputed, anonymous tips, standing alone, are entitled to little weight. *See, e.g.*, *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006); *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994); *see also Florida v. J.L.*, 529 U.S. 266, 268-69 (2000) (holding that an anonymous tip that a person is carrying a gun — without any corroborating evidence — did not provide reasonable suspicion of criminal wrongdoing justifying the officer's stop and frisk of that person). No witness who was willing to identify himself identified Frank Prater, and the officers had multiple identifications of Heather and one weak ID of Mark. The Ewings cite no similar case in which a constitutional violation was found, nor do they establish that given the conflicting evidence that the officers possessed, that only a plainly incompetent officer or one intent on knowingly violating the law would have concluded that probable cause had dissipated. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). Further, we note once again that the officers shared the new information with Fleming, who nevertheless elected to proceed.

## E. Absolute Immunity as to DA-Defendants

**[17]** A prosecutor is entitled to absolute immunity from a civil action for damages when he or she performs a function that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). A prosecutor's functions that are protected by absolute immunity include initiating a prosecution and presenting the State's case, *id.* at 431, appearing at a probable cause

> hearing to support an application for a search warrant, [*Burns v. Reed*, 500 U.S. 478, 492 1991)], and preparing and filing an arrest warrant. *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997). However, the functions of an advocate do not include advising police officers whether probable cause exists during their pretrial investigation, *Burns*, 500 U.S. at 493, fabricating evidence before probable cause has been established, *Buckley v. Fitzsimmons*, 509 U.S. 259, 275 (1993), or attesting to the facts that support an arrest warrant. *Kalina*, 522 U.S. at 130-31.

*KRL v. Moore*, 384 F.3d 1105, 1110-11 (9th Cir. 2004). Qualified rather than absolute immunity is generally presumed to be "sufficient to protect government officials in the exercise of their duties," and the Supreme Court has declined "to extend [absolute immunity] any further than its justification would warrant." *Burns*, 500 U.S. at 486-87 (internal quotation marks omitted).

**[18]** "To determine whether an action is 'prosecutorial,' " and thus warrants absolute immunity, we analyze the nature of the function performed. *Al-Kidd v. Ashcroft*, 580 F.3d 949, 958 (9th Cir. 2009). Thus, prosecutors are entitled to absolute immunity not only when they represent the state in court, but also when they engage in activities "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. However, while prosecutors will inevitably participate in activity preliminary to filing charges, they are entitled to absolute immunity " 'only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.' " *Al-Kidd*, 580 F.3d at 958 (quoting *Burns*, 500 U.S. at 494); *see also Genzler v. Longanbach*, 410 F.3d 630, 637 (9th Cir. 2005) ("In other cases, the Court has held that a prosecutor does not have absolute immunity for providing legal advice to police that probable cause exists to arrest a suspect, *Burns*, 500 U.S.

at 491, or for personally attesting to the truth of evidence in support of charging documents, *Kalina*, 522 U.S. at 130.").

The Ewings concede that Fleming is entitled to absolute immunity for his decisions to charge Heather and Mark with murder and not to release them between November 10 and 15, *see Morley v. Walker*, 175 F.3d 756, 760 (9th Cir. 1999) (stating that a prosecutor's failure to dismiss charges after learning of new information is protected by absolute immunity), but argue that he is not so entitled for advising the officers to add book murder charges on November 8. We agree.

[19] The Supreme Court has clearly stated that with respect to advising police, prosecutors are entitled to qualified not absolute immunity. *Burns*, 500 U.S. at 492-95. Noting the absence of a common law tradition supporting absolute immunity, the Court stated: "Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Ironically, it would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not." *Id.* at 495 (internal citation omitted).

[20] In the present case, the district court appears to have mistakenly limited *Burns* to apply only to situations where prosecutors advise police about prospective investigative techniques. Although the *Burns* Court sometimes characterized the prosecutor's role as "investigative," it clearly held that with respect to advising police that they had probable cause to arrest, the prosecutor was not entitled to absolute immunity.[22] *See also Harris v. Bornhorst*, 513 F.3d 503, 510 (6th

---

[22]The district court relied primarily on *Spivey v. Robertson*, 197 F.3d 772 (5th Cir. 1999), but that case, which never even mentioned *Burns*, involved advice to the police in connection with a court filing. The district court cited two other cases, one of which, *Flavel v. Logsdon*, 718 F. Supp. 836 (D. Or. 1989), predates *Burns* and relied on cases that *Burns* rejected. The other, *Orobono v. Koch*, 30 F. Supp. 2d 843 (E.D. Pa. 1998), does not cite *Burns* and contains little analysis.

Cir. 2008) ("[I]n *Prince v. Hicks*, 198 F.3d 607 (6th Cir. 1999), we affirmed the denial of absolute immunity to a prosecutor who advised police that probable cause existed to arrest a suspect."), *cert. denied*, 128 S. Ct. 2938 (2008); *Mink v. Suthers*, 482 F.3d 1244, 1260 (10th Cir. 2007) ("Advising police on interrogation methods or 'the existence of probable cause' does not qualify" for absolute immunity.) (quoting *Burns*, 500 U.S. at 487), *cert. denied*, 128 S. Ct. 1122 (2008); *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004) ("The absolute immunity of a prosecutor does not extend to his giving legal advice to the police when they are investigating whether a crime has occurred."); *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) ("Nor is advising the police during the investigative stage of a case that they have probable cause to arrest an advocacy function.").

The DA-defendants argue that Fleming's advice to Reyes was a "charging decision." But Reyes testified that Fleming advised him about probable cause on November 8, and the record indicates that Fleming did not make a charging decision until November 10. *See, e.g.*, *Van Deelen v. City of Eudora, Kan.*, 53 F. Supp. 2d 1223, 1231 (D. Kan. 1999) ("Thus, the question is not simply a matter of whether the prosecutor communicated advice to the police but rather was the advice closely associated to the attorney's decision to prosecute."); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (stating that absolute immunity applies to "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury *after a decision to seek an indictment has been made*") (emphasis added); *Johnson v. City of Meridian*, 23 F. Supp. 2d 681, 684 (S.D. Miss. 1998) (rejecting absolute immunity where the prosecutor was not "merely informing the officer of his decision to initiate criminal proceedings," but rather "was effectively advising the officer that probable cause for the arrest existed, a situation akin to that in *Burns*").

The DA-defendants also note that the police had already arrested Mark and Heather on drug and gun charges. However, as discussed, the addition of the murder charges caused Mark and Heather to be detained without bail. *See Holmes*, 511 F.3d at 683 ("It is reasonable to demand that each charge that a police officer elects to lodge against the accused be supported by probable cause. Otherwise, police officers would be free to tack a variety of baseless charges on to one valid charge with no risk of being held accountable for their excess.").

**[21]** In sum, qualified rather than absolute immunity is generally sufficient to protect government officials in the course of their duties, and a litigant seeking the greater protection "bears the burden of demonstrating that absolute immunity is justified for the function in question." *Botello v. Gammick*, 413 F.3d 971, 976 (9th Cir. 2005). In the present case, the record does not support a finding of absolute immunity for Fleming.

**[22]** Alternatively, the DA-defendants contend that Fleming is entitled to qualified immunity, arguing that a reasonable prosecutor has every reason to expect that it is lawful to apply charges to a criminal defendant in custody based on information provided by the police. But the DA-defendants do not discuss the specifics of Fleming's decision, and their argument largely rehashes their absolute immunity claim. We therefore decline to address the issue and remand the case for an initial determination by the district court of whether Fleming is entitled to qualified immunity.

The district court granted summary judgment to DA Phillips based on its determination of absolute immunity as to Fleming. For the reasons stated, Fleming is not entitled to absolute immunity. However, we affirm the dismissal of Phillips from the case on other grounds.

**[23]** The Ewings allege no personal involvement by Phillips in the relevant events, and there is no respondeat superior

liability under § 1983. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983."). The Ewings fare no better proceeding against Phillips in his "official capacity." Setting aside the issue of whether official capacity claims against a district attorney are subject to dismissal under the Eleventh Amendment, *see Pitts v. County of Kern*, 949 P.2d 920, 930-31 (Cal. 1998) (holding that California district attorneys act as agents of the state when they prosecute cases and establish policy and train employees in this area), and assuming arguendo that appellants could bring a *Monell*-type claim against Phillips as head of the *County* DA's office, appellants fail to present any evidence that a municipal policy caused their injury. *See Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 690-695 (1978) (authorizing municipal liability under § 1983 when a municipality's "policy or custom" causes a violation of an individual's federal rights).

**[24]** In the district court, the only "policy" the Ewings mentioned was the police practice of conferring with the district attorney's office before arresting someone for murder. We fail to see how such policy, if it qualifies as one, caused appellants' injuries. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). The problem here was not that Reyes conferred with Fleming pursuant to the policy (as discussed above, courts have long noted that such consultation is a good idea), it was that Fleming may have given bad advice. That bad advice cannot be attributed to the policy or, absent some evidence that he ratified it, to Phillips. *See id.* at 387 ("Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability

would then rest on *respondeat superior*."); *Houghton v. Cardone*, 295 F. Supp. 2d 268, 277 (W.D.N.Y. 2003) ("Where, however, liability is premised on the policymaker's approval of a subordinate's unlawful act, it must be shown that the policymaker ratified both the 'subordinate's decision and the basis for it,' *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), as municipalities cannot be liable on a theory of respondeat superior."). The Ewings also alleged in the complaint that Phillips adopted and ratified the actions of the DA defendants, but nothing in the record supports this assertion. Therefore, we must dismiss Phillips from the case.

## IV.  CONCLUSION

[25] For the foregoing reasons, we affirm in part, reverse in part and remand for further proceedings. Each party shall bear its own costs on appeal.