**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY W. SMITH; TERESA SMITH,
　　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

ROBERT ALMADA, Santa Monica
Police Sergeant,
　　　　　　*Defendant-Appellee.*

Nos. 09-55334
　09-55346

D.C. No.
2:06-cv-1626-
AHM

ORDER AND
OPINION

On Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
June 9, 2010—Pasadena, California

Filed March 21, 2011

Before: Dorothy W. Nelson and Ronald M. Gould,
Circuit Judges, and James S. Gwin, District Judge.*

Opinion by Judge Gwin;
Concurrence by Judge Gould;
Concurrence by Judge Gwin;
Dissent by Judge D. W. Nelson

---

*The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

3783

**COUNSEL**

Brett J. Vottero, Springfield, Massachusetts, for the appellants.

Anthony P. Serritella, Deputy City Attorney, Santa Monica, California, for the appellee.

---

**ORDER**

The opinion and dissent in the above-captioned matter filed on October 19, 2010, and published at 623 F.3d 1078, is WITHDRAWN. The superseding opinion, dissent, and concurrences shall be filed concurrently with this order.

The parties shall have fourteen (14) days from entry of the superseding opinion to file petitions for rehearing or petitions for rehearing en banc in the above-captioned matter.

**IT IS SO ORDERED.**

---

**OPINION**

GWIN, District Judge:

Plaintiffs Anthony Smith and his wife Theresa Smith appeal the district court's grant of summary judgment to Defendant Santa Monica Police Sergeant Robert Almada on Smith's claims for false arrest, malicious prosecution, and suppression of exculpatory evidence and on Theresa Smith's substantive due process claim for deprivation of familial relations.[1] In support of his action against Almada, Smith claims

---

[1]The parties agree that Teresa Smith's claim is entirely dependent on the survival of her husband's claims. Because we affirm the dismissal of Smith's claims, we also affirm the dismissal of his wife's claims.

that Sergeant Almada failed to disclose materially exculpatory evidence in Smith's criminal arson trial—including a false identification by a key witness that Smith was gloating at the arson scene in the months following the fire. Although Smith's first trial resulted in a mistrial after the jury was unable to reach a verdict, he says that access to the exculpatory evidence would have caused the judge not to issue an arrest warrant or would have resulted in an acquittal. We have jurisdiction under 28 U.S.C. § 1291, and we affirm after finding that the arguably non-disclosed evidence would not have resulted in a different outcome.

## I

In the early morning hours of February 13, 2003, a fire started inside Simply Sofas, a furniture store owned by Marilyn Nelson. The fire and smoke largely destroyed the store's inventory, causing more than $2.8 million in damage.

After investigating, fire inspectors determined that an arsonist used three five-gallon water bottles filled with gasoline and stuffed with rolled-up periodicals, newspapers, and other gasoline-soaked mail as "firebombs" to start the fire. Under the melted remains of one bottle, the investigators also found an irregularly shaped piece of asphalt that matched a hole in the alley across the street from the furniture store. The investigators concluded that the arsonist broke the store window, likely with the asphalt, and placed the gasoline-filled bottles on a table just inside the window. They believed the arsonist then ignited the fires.

The gasoline-soaked papers that the investigators found inside the melted bottles included numerous pieces of mail addressed to Appellant Smith's residence over a five-year period, including: a July 1997 U.S. News magazine addressed to Anthony Smith, a December 1999 U.S. News magazine addressed to Anthony Smith, a January 2000 Motorcycle Rider magazine addressed to Anthony Smith, a 2002 tenant

notice issued by Smith's apartment complex, a 2002 express mail envelope signed for by Anthony Smith, a Fall/Winter 2002 JCPenney catalog addressed to "Aundrea Smith," a University of Alabama envelope addressed to Anthony Smith, a March of Dimes envelope addressed to Anthony Smith, a handwritten greeting card addressed to "the beloved Smith family," a Rochester Clothing catalog addressed to Teresa Smith, a Los Angeles Music Center mailer addressed to Anthony Smith, and a Mark Taper Forum mailer addressed to Anthony Smith. The bottle did not include mail from any other individuals. The investigators also found the burnt business card of a Beverly Hills woman who worked for Smith.

Soon after the fire was under control, Defendant Santa Monica Police Sergeant Robert Almada took over the investigation. Almada had investigated four previous fires set in dumpsters behind 2408 Lincoln Boulevard in October and November 2002. Simply Sofas stood at 2314 Lincoln Avenue. With regards to one of the dumpster fires, Almada reported that the "fire source" might be a "possible chemical based incendiary device in a plastic container." Witnesses to those earlier fires (including store owner Nelson) described different suspects, none resembling Smith.

In his investigation of the February 2003 fire, Sergeant Almada interviewed Nelson, who said that she, her daughter and son-in-law (both business partners in the store with Nelson), and a clerk had keys to the store. Nelson told Sergeant Almada that she and her son-in-law closed the store early the evening of the fire and that her son-in-law locked all of the doors.

According to Nelson, her business was in healthy financial condition: Annual sales were approximately $3 million, with profits around $400,000. The store had almost no debt. Nelson had never made a business- or fire-related insurance claim. Nelson did, however, receive insurance proceeds for the February 2003 fire.

At the time of the initial interview, Sergeant Almada asked Nelson if she could think of anyone with a motive for the arson. Nelson mentioned a former employee whom she had recently fired and a few other names, but not Smith.

Nevertheless, Sergeant Almada began to focus his investigation on Smith because Smith's mail—pieces received over a long period of time and from a variety of sources—had been used as a wick to start the fire at Simply Sofas. Almada questioned Smith, who described selling items on consignment through Nelson's store and stated that he and Nelson had a "minor issue" in January 2003 arising out of a broken item and a stop-payment order that Nelson had placed on a check paid to Smith.

Sergeant Almada then circled back to speak with Nelson. After Almada told Nelson that Smith was a suspect, Nelson described an "uncomfortable and tense" January 2003 dispute with Smith. The dispute centered over whether a consigned item was damaged before or after being sold to Nelson. Nelson said that when Smith dropped by her store to pick up payment for his consignment items, she told Smith that one of his consignment items had been broken before Smith delivered it to Nelson's store, and that she would not pay him the full amount for the item. But Smith claimed that one of Nelson's employees broke the item and demanded that Nelson pay for it. Nelson said that Smith's demeanor during their argument was threatening and frightening and that he stuck his finger in her face. To end the dispute, Nelson promised to give Smith an additional check for the broken item. Smith's assistant later called Nelson and said that Smith had lost the first check, so Nelson wrote Smith a second check for the value of the original consignment check plus the value of the broken item. After learning that Smith had not lost the first check, but instead had cashed it, Nelson stopped payment on the second check. Nelson said she felt that Smith was trying to intimidate her into paying more than she owed him.

In addition—and central to Smith's claims against Sergeant Almada—Nelson claimed to have seen Smith in front of her boarded-up store on the afternoon of June 28, 2003, "laughing and smiling" as he pointed to the area of the fire's origin. However, Sergeant Almada's investigation ultimately showed that Nelson's statement was false: Sergeant Almada viewed a security tape from Smith's apartment building showing that Smith was at home on June 28, 2003, the day Nelson claimed to have seen him.

Sergeant Almada confronted Smith with the evidence against him, especially the evidence that letters and mailings to Smith had been used as a wick for the firebombs. According to Sergeant Almada, upon learning of the scale of the fire and the evidence against him, Smith slumped over, began to cry, and apologized repeatedly. Smith recalls the conversation differently, claiming that Sergeant Almada told him that firefighters were fatally injured in the fire and that he cried and said he was sorry for their death but never said that he was involved. Smith gave no explanation for how his mail from over a five-year period ended up in the firebombs, but continued to deny involvement in the fire. Sergeant Almada did not arrest Smith at that time.

Instead, Sergeant Almada met with deputy district attorney Jean Daly to discuss the case against Smith. Daly does not recall discussing the prior dumpster fires behind Nelson's store, Sergeant Almada claims that he mentioned the previous fires to prosecutor Daly but and said he doubted that they were related to the February 2003 fire. Sergeant Almada did not tell Daly about Nelson's false report of Smith's gloating. After hearing Sergeant Almada's account of the evidence against Smith, prosecutor Daly recommended that Sergeant Almada obtain a warrant for Smith's arrest.

Consequently, Sergeant Almada sought an arrest warrant from Los Angeles Superior Court Judge Richard Neidorf, who authorized the warrant. Sergeant Almada then arrested

Smith, and prosecutor Daly filed a criminal complaint charging Smith with arson. Smith did not make bail after his arrest and remained in jail through his first trial in June 2004.

At Smith's first trial, Nelson testified that her January 2003 dispute with Smith "shocked" and "intimidated" her. She said that Smith looked at her in a "very threatening" manner and "pushed his finger and almost to my face," and that as a result she was "frightened" and "very intimidated." Smith's defense attorney knew about and attempted to introduce evidence of the October 2002 dumpster fire—which predated Smith's altercation with Nelson—but the trial court granted the prosecution's motion *in limine* to exclude the evidence.

At the conclusion of the first trial, the jury could not reach a verdict, with five jurors voting "guilty" and seven jurors voting "not guilty."

After the court declared a mistrial, prosecutor Daly reviewed the case with the head deputy district attorney, who approved Daly's recommendation to retry the case. Smith remained in custody.

At Smith's second trial in December 2004—on substantially the same evidence—the jury again could not reach a verdict, this time with one juror voting to convict and eleven jurors voting to acquit. The trial court then dismissed the case against Smith under California Penal Code § 1385, finding that although "there are certainly strong inferences to suggest that Mr. Smith did this," the prosecution would never be able to obtain a unanimous verdict. Only after this dismissal was Smith released from custody.

Thereafter, the Smiths sued Sergeant Almada under 42 U.S.C. § 1983 in state court for false arrest and malicious prosecution. The case was then removed to federal district court. Although the Smiths did not make any distinct *Brady* claim in their complaint, the district court overruled Defen-

dant Almada's objection that the *Brady* claim was made only after discovery had been completed and should therefore not be considered.

After discovery, the district court granted Sergeant Almada's summary judgment motion. On the false arrest claim, the district court held that Sergeant Almada was entitled to qualified immunity because a competent officer could reasonably have determined that probable cause existed to arrest Smith for arson. On the malicious prosecution claim, the district court concluded that Sergeant Almada did not knowingly submit material false information to the prosecution. Finally, on the failure to disclose exculpatory evidence claim, the district court held that the allegedly withheld evidence—the fact that Nelson's testimony about Smith's gloating at the crime scene was false—would not have materially affected Smith's trial.

This appeal followed.

## II

We review *de novo* a district court's grant of summary judgment. *See, e.g.*, *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Accordingly, we must determine, viewing the evidence in the light most favorable to Smith, whether any genuine issues of material fact exist and whether the district court correctly applied the substantive law. *Id.* at 922.

## A

With his amended complaint, Smith made claims of false arrest and malicious prosecution. Smith's first claim—which the district court dismissed on qualified immunity grounds— is that Sergeant Almada violated his Fourth Amendment rights by arresting him without probable cause.

Although a private party may bring a § 1983 claim for an arrest pursuant to an improperly issued arrest warrant, *see*

*Malley v. Briggs*, 475 U.S. 335, 342 (1986), qualified immunity shields the arresting officer from suit when he or she "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The doctrine immunizes reasonable mistakes, thus freeing officers to "make difficult decisions in challenging situations" without allowing fear of liability to "disrupt[ ] the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

In a garden-variety false arrest claim challenging the probable cause for an arrest, if the arrest warrant is facially valid, the arresting officer enjoys qualified immunity unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existing unreasonable . . . ." *Malley*, 475 U.S. at 344-45; *see also KRL v. Estate of Moore*, 512 F.3d 1184, 1190 (9th Cir. 2008) ("[A]n officer who prepares or executes a warrant lacking probable cause is entitled to qualified immunity unless no officer of reasonable competence would have requested the warrant."). Here, however, Smith does not contend that Sergeant Almada's warrant application lacked probable cause on its face. Instead, Smith argues that Sergeant Almada misled the magistrate judge when applying for the warrant, and had the magistrate considered all of the facts that the magistrate would not have found probable cause.

**[1]** To maintain a false arrest claim for judicial deception, a plaintiff must show that the officer who applied for the arrest warrant "deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004). The materiality element—a question for the court, *see id.*—requires the plaintiff to demonstrate that "the magistrate would not have issued the warrant with false information redacted, or omitted information restored." *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997). For exam-

ple, in *Ewing v. City of Stockton*, 588 F.3d 1218 (9th Cir. 2009), we concluded that a warrant application's two false statements about the plaintiff were not material because an independent, reliable source's detailed description of the incident and identification of the plaintiff at the scene were sufficient to establish probable cause. *Id.* at 1224-25. And in *Lombardi*, although a drug search warrant application failed to mention that the two confidential informants—whose statements were the only evidence that the plaintiff had drugs in his home—had axes to grind with the plaintiff, we nevertheless held that the omitted information was immaterial because the informants' statements were given independently, were detailed, were based on personal observation, were corroborated by one another, and were against one informant's penal interests. 117 F.3d at 1126-27.

Here, Smith contends that the magistrate would not have issued the arrest warrant if Sergeant Almada's warrant application had not included false representations—that Nelson had independently recalled her dispute with Smith and that Smith's tearful apologies were a tacit admission to the crime —but instead had included (1) the details of the four dumpster fires predating Smith's altercation with Nelson, (2) the other suspects in the February 2003 fire, and (3) the fact that Nelson falsely claimed to have seen Smith gloating at the crime scene several months after the fire.

**[2]** Yet even if Sergeant Almada falsified and omitted this information (as Smith contends), the corrected report and warrant application would still have contained facts sufficient to establish probable cause to arrest Smith for arson. First, even without Nelson's testimony about the payment dispute with Smith over his consigned items that occurred less than one month before the fire—which would have been less credible in light of Nelson's false report about Smith's gloating— Sergeant Almada's corrected report still would have contained Smith's own admission of the dispute. And, more importantly, Sergeant Almada's corrected report would still

have recounted that the firebombs contained numerous pieces of mail from over a five-year period addressed over a five-year period to Smith and his wife at their residence—a fact that Smith could not explain to Almada or at trial. This evidence linking Smith to the fire was sufficient to overcome any negative inferences the magistrate might have drawn from the earlier dumpster fires.

**[3]** These facts, together with the evidence of a motive, gave probable cause to believe that Smith was guilty of arson. Thus, because the changes suggested by Smith to Sergeant Almada's warrant application do not compel the conclusion that "a neutral magistrate would not have issued the warrant," *Lombardi*, 117 F.3d at 1126, we conclude that the district court properly granted summary judgment against Smith on his false arrest claim.

**B**

Smith's second claim is that Sergeant Almada's false statements and failure to disclose material information to the prosecutor caused Smith's malicious prosecution.

**[4]** A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others—including police officers and investigators—who wrongfully caused his prosecution. *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002). To maintain a § 1983 action for malicious prosecution, a plaintiff must show that "the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995); *see also Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009) ("[P]robable cause is an absolute defense to malicious prosecution.").

**[5]** As explained above, even after correcting for the allegedly false and omitted information in Sergeant Almada's war-

rant application, probable cause supported Smith's arrest for arson. For the same reason, probable cause supported Smith's prosecution. Thus, the district court correctly granted summary judgment for Sergeant Almada on Smith's malicious prosecution claim.

## C

Smith's final claim is that Sergeant Almada violated his due process rights by failing to disclose material exculpatory evidence—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

[6] *Brady* requires both prosecutors and police investigators to disclose exculpatory evidence to criminal defendants. *See Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009) (allowing § 1983 claim against police inspector for *Brady* violation). To state a claim under *Brady*, the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). As to the prejudice prong, the Supreme Court has stated that "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281.

Here, Smith contends that Sergeant Almada should have disclosed the four previous dumpster fires that occurred on October 7, 2002, October 15, 2002, November 21, 2002, and November 25, 2002. In investigating these fires, Almada received three suspect descriptions that neither matched each other nor matched Smith. Smith also says that Almada should have disclosed Nelson's false statement that she saw Smith gloating at the crime scene. Smith argues that had Sergeant Almada disclosed this information, the jury in Smith's first

trial would have acquitted him (or, at the very least, the judge in Smith's first trial would have dismissed the case immediately after the mistrial), and thus Smith would not have remained in jail for five months until his second trial.

In considering Smith's *Brady* claim, District Court Judge Howard Matz found that "Almada is not liable under *Brady* because the evidence he omitted or misstated would not have materially affected the outcome of the criminal prosecution." We agree.

**[7]** Smith's *Brady*-based § 1983 claim fails because he has not shown that the withheld evidence was material. First, the evidence of the suspects' descriptions in the previous dumpster fires is not material because it does nothing to undermine the strong physical evidence—i.e., the numerous pieces of mail—linking Smith to the February 2003 fire. Nor does it call into question evidence suggesting Smith's motive: Smith himself admitted that he had a dispute with Nelson less than three weeks before the fire.

Second, several differences between the February 2003 fire and the earlier fires undermine the inference that there was one dumpster arsonist or that one of the dumpster arsonists started the February 2003 fire. Although Sergeant Almada reported that one of the dumpster fires may have been started with an incendiary device in a plastic container, the similarities between the fires end there. The dumpster fires occurred in quick succession over a few weeks; the February 2003 fire occurred three months later. The dumpster fires barely damaged the building's interior; the February 2003 fire ravaged Simply Sofas. Witnesses to the dumpster fires described various suspects with very different appearances, suggesting there was no repeat offender who might have later started the February 2003 fire. And Nelson did not identify any of the dumpster fire suspects as having a grudge against her—and thus a motive to target Nelson's store itself.

**[8]** More importantly, Smith does not show that any failure to disclose the earlier fires had any effect. Even without a prosecution disclosure of the earlier fires, Smith's attorney otherwise knew about the October 15, 2002 fire and sought to introduce evidence of that fire at trial. In response to Smith's offer of evidence regarding the October 15 fire, the prosecutor moved the state trial court to exclude evidence of that fire because there was no "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *See People v. Hall*, 718 P.2d 99, 104 (Cal. 1986). The state trial court agreed and excluded the evidence. Thus, Smith's attorney knew of at least one earlier fire, and evidence of those earlier fires was likely inadmissible under California evidence law in any case. In sum, we cannot say that had Sergeant Almada disclosed evidence of the earlier dumpster fires, the outcome of Smith's first trial would have been different.

**[9]** We are more troubled by Sergeant Almada's failure to disclose Nelson's false account of Smith's gloating at the crime scene. Importantly, Nelson did not testify about the gloating incident at Smith's first trial. Thus, evidence of her false account could have been used only to impeach Nelson's character for truthfulness. *See* Fed. R. Evid. 608(b)(1). But Nelson's testimony was not crucial at Smith's trial. Although Nelson's account of her business dispute with Smith helped establish a motive for Smith to commit the arson, Smith himself admitted the dispute to Sergeant Almada and Almada testified about his interviews with Smith. Moreover, even if the jury discredited all of Nelson's testimony, it still possessed the important and unexplained evidence linking Smith to the fire: the numerous pieces of mail from over a five-year period addressed to Smith and his wife at their residence.

**[10]** Even if Sergeant Almada had disclosed Nelson's false account of Smith's gloating at the crime scene before Smith's first trial, we do not find "a reasonable probability of a different result." *Banks v. Drake*, 540 U.S. 668, 699 (2004). Almada's failure to disclose the evidence does not sufficiently

undermine our confidence in the outcome of Smith's trial. *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (plaintiff must show "there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense"). Hence, because the evidence that Sergeant Almada failed to disclose was not material, we hold that the district court correctly granted summary judgment for Sergeant Almada on Smith's *Brady* claim.

## III

For the reasons above, we affirm the district court's grant of summary judgment to Appellee Sergeant Almada.

**AFFIRMED.**

---

GOULD, Circuit Judge, concurring:

I concur in Judge Gwin's opinion. I add this separate concurrence to point out that I think the substantive idea in Judge Gwin's separate concurrence is a good one, and that I would personally be inclined to follow the united view of all circuits to have reached that issue. *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988). *But cf. Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010) (declining to decide the issue). Nonetheless, on reconsideration I decline to reach the issue at this time. Several colleagues on our court have urged that the issue be left open, and I haven't seen a statement from any colleague urging that we decide the issue now. In light of these objections from some colleagues and because the substantive idea that a conviction is a prerequisite to a *Brady* claim is not needed to decide this appeal, I have withdrawn my precedential support for that idea so that it can be addressed on a fresh slate in some other case.

GWIN, District Judge, specially concurring:

With the motion for rehearing, Judge Gould has withdrawn his concurrence in the holding that a *Brady* claim cannot be made where there has not been a conviction. Some wisdom supports avoiding constitutional questions where cases can be decided on other grounds. *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"); *see also Citizens United v. Federal Election Com'n*, ___ U.S. ___, 130 S.Ct. 876, 937 (2010) (Stevens, J., concurring in part and dissenting in part.)

Until recently, however, we would have been required to address the constitutional issue before addressing any Section 1983 immunity issue. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled by Pearson v. Callahan*, 555 U.S. 223 (2009). And, deciding the materiality issue somewhat begs the question: material to what constitutional right? *See, e.g.*, *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, ___ U.S. ___, 130 S.Ct. 2592, 2604 (2010) ("In sum, Justice BREYER cannot decide that petitioner's claim fails without first deciding what a valid claim would consist of.") Because Plaintiff Smith must show both a violation of a constitutional right and that the failure to disclose was material, I believe we should have addressed whether a constitutional right was impaired before moving to whether any violation was material.

In addition to finding that the non-disclosed evidence was insufficiently important to undermine confidence in the outcome of Smith's trial, I would also find that Smith cannot make a *Brady* claim where there has been no conviction.

Smith makes a novel argument. In most *Brady*-based § 1983 claims, the plaintiff has suffered a criminal conviction,

arguably because the government failed to disclose exculpating evidence. But no jury ever convicted Smith. Instead, Smith says he was injured by the five months he spent in jail after the first trial and until the judge in his second trial dismissed the charges against him.

Three of our sister circuits have found that a defendant who is ultimately acquitted cannot maintain a *Brady* claim. *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) ("Plaintiff . . . was never convicted and, therefore, did not suffer the effects of an unfair trial. As such, the facts of this case do not implicate the protections of *Brady*."); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988) (holding that "[b]ecause the underlying criminal proceeding terminated in appellant's favor, he has not been injured by the act of wrongful suppression of exculpatory evidence" and thus cannot maintain *Brady*-based § 1983 claim); *cf. also Taylor v. Waters*, 81 F.3d 429, 435-36 (4th Cir. 1996) (finding that no settled Fourth Amendment authority prohibited officer from withholding exculpatory evidence from § 1983 plaintiff who was never tried on underlying criminal charges). No known cases have allowed a *Brady*-based § 1983 claim where there has not been a conviction.[1]

Moreover, although the Seventh Circuit has not completely foreclosed *Brady*-based § 1983 claims without a conviction,

---

[1]With her dissent, Judge Nelson relies only upon cases—most of them habeas cases—where there had been a conviction. *See, e.g. Kyles v. Whitley*, 514 U.S. 419 (1995) (Habeas action where petitioner had been convicted of murder and sentenced to death.); *Brady v. Maryland*, 373 U.S. 83 (1963) (Same); *United States v. Agurs*, 427 U.S. 97 (1976) (Same); *Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006) (Same); *Giglio v. United States*, 405 U.S. 150 (1972) (Direct appeal after conviction for passing forged money orders).

it requires the plaintiff to show that no trial would have occurred if police had disclosed the exculpatory or impeachment evidence. *See Bielanski v. County of Kane*, 550 F.3d 632, 644 (7th Cir. 2008) (expressing doubt that " 'an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation,' " but concluding that plaintiff's claim fails where "the decision to go to trial would not have been affected by the allegedly withheld evidence") (citation omitted); *Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010) (same).

These courts logically find that an acquitted defendant fails to establish a *Brady* violation because he cannot show "that the favorable evidence could reasonably be taken to put the whole case in such a different light *as to undermine confidence in the verdict*." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (emphasis added). *See also Banks v. Drake*, 540 U.S. 668, 699 (2004) ("[Defendant] must show a reasonable probability of a different result."); *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (plaintiff must show "there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense").

These decisions accord with the purpose of *Brady*. At its core, *Brady* seeks to ensure a fair trial, a trial whose verdict is reliable. As the *Brady* Court explained: "The principle . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87-88.

In dissent, Judge Nelson seems to argue that *Brady* requires punishment of police or prosecutors when they fail to turn over arguably exculpatory evidence, even where no conviction results. Judge Nelson says that if *Brady* is not interpreted to allow civil actions where there has been no conviction, it will give "perverse incentives for police and prosecutors who believe they will not successfully convict a particular criminal

defendant [ ] to suppress evidence, knowing that the suppression would not result in a successful *Brady* claim and the suspect would at least be subject to a lengthy criminal trial."[2] But, of course, this presupposes that police or prosecutors would, or could, accurately calculate whether a conviction would occur—and they would make this calculation knowing that if they were wrong in predicting acquittal and a conviction resulted instead, they would face civil liability for their *Brady* violation. It seems extraordinarily unlikely that police or prosecutors make this calculation.

And, as described below, we allow false arrest and malicious prosecution claims where police or prosecutors lack probable cause to arrest or prosecute defendants. Such claims better focus consideration to the appropriate issue: did the undisclosed *Brady* material undermine probable cause to arrest or prosecute Smith.

Against this backdrop, Smith says our decision in *Haupt v. Dillard*, 17 F.3d 285 (9th Cir.1994), allows his *Brady* claim even though he never suffered a conviction. I believe *Haupt* distinguishable, find it was based upon a Supreme Court holding that has since been overruled, and find little reason to apply it to this case.

In *Haupt*, during a conference on jury instructions for Haupt's murder trial, the judge indicated to counsel that he intended to give the jury an instruction recommending acquittal. 17 F.3d at 287. The prosecutor objected, and the investigating police officer later telephoned the judge and told the judge to say that giving an acquittal recommendation would be ridiculous. *Id.* The judge declined to give the recommendation, noting that he felt intimidated by the officer's statement.

---

[2]Although I have presided over at least 400 state and federal felony trials—including a large number that resulted in acquittals—I admit that I am less capable of predicting an acquittal than the police officers described by Judge Nelson.

*Id.* Nevertheless, the jury acquitted the defendant, who then brought a § 1983 claim against the officer for depriving him of the right to a fair trial. *Id.*

We held that the plaintiff stated a claim for violation of his due process right to a fair trial—*i.e.*, the right to "get the unbiased judge to which he was entitled," *id.*—and that his acquittal "sp[o]k[e] only to the amount of damages he suffered" and was "irrelevant to whether he has a cause of action," *id.*[3]

In reaching this conclusion, we relied upon *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), a case that allowed a § 1983 action for a *Miranda* violation even though the suspect was never charged and the statement was never used. But in 2003—after *Haupt*—the Supreme Court overruled *Cooper. See Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (Thomas, J.) ("We fail to see how, based on the text of the Fifth Amendment, Martinez can allege a violation of this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case."); *id.* at 778-79 (Souter, J., concurring in judgment) ("I do not . . . believe that Martinez can make the 'powerful showing,' subject to a realistic assessment of costs and risks, necessary to expand protection of the privilege against compelled self-incrimination to the point of the civil liability he asks us to recognize here.").

Thus, *Haupt* is distinguishable because it involved a claim for violation of the general due process right to a fair trial—not, as here, a *Brady* claim. Moreover, *Haupt* relied upon authority that has since been overruled. Finally, *Haupt* is inconsistent with *Brady*'s rationale of ensuring a verdict worthy of confidence. I do not believe this Court should extend *Haupt* to Smith's *Brady* claim.

---

[3]On its own terms, *Haupt* seems questionable, even when *Cooper* was good law. While *ex parte* contacts from an investigating police officer to a judge are completely improper, the judge ultimately had the responsibility to properly instruct the jury.

In addition, extending *Brady* to cases without a conviction makes the materiality standard far less workable. In Smith's case, to show a reasonable probability that the result of the first trial would have been different, Smith would need to show that none of the jurors in his first trial would have voted to convict if presented with Nelson's false claim that she saw Smith gloating at the fire scene. Such a calculation (whether there is a reasonable probability that the undisclosed evidence would have caused *all* the jurors to acquit) is significantly different from the calculation in a post-conviction *Brady* claim (whether there is a reasonable probability that the undisclosed evidence would have caused a single juror to vote to acquit).

Allowing *Brady*-based § 1983 claims without a conviction would open the door to a potentially unlimited number of such claims for decisions at every stage of the criminal process. If a police officer failed to disclose victim statements until the start of trial (resulting in a mistrial), and the defendant was jailed for 530 days before retrial but ultimately acquitted, would the defendant have a § 1983 claim? *See Williams v. Krystopa*, No. 98-CV-1119, 1998 WL 961375, at *4 (E.D. Pa. Dec. 16, 1998) ("Plaintiff ultimately did receive a fair trial because [the victim] statement was uncovered in time for its effective use at trial. Moreover, the trial court was able to reach a just conclusion: it declared a mistrial when testimony showed Plaintiff had not received the witness statements, and held a full trial at which Plaintiff, then in possession of the statements, was acquitted. . . . [J]ustice finally did prevail and Plaintiff received a fair trial and a verdict worthy of confidence. . . . [Thus,] no *Brady* violation occurred."), *aff'd* 211 F.3d 1263 (3d Cir. 2000) (unpublished). Would a police officer's failure to provide a defendant with exculpatory evidence support a § 1983 claim where the defendant incurred defense costs but the criminal charges were dismissed before trial? *See Morgan*, 166 F.3d at 1310 (in cases where all criminal charges were dismissed prior to trial, "courts have held universally that the right to a fair trial is not implicated and, therefore, no cause of action exists under

§ 1983") (citing cases). Our inability to find a principled way to limit these types of *Brady* claims is therefore a further reason against recognizing the claim Smith makes here.

Recognizing *Brady* as a post-conviction right does not foreclose all constitutional remedies where a defendant has been tried but not convicted. Where a criminal defendant believes that withheld exculpatory evidence has caused charges to be brought and maintained against him, but no conviction has resulted, his remedy would flow from a false arrest or malicious prosecution claim, and not from *Brady*.

Indeed, on appeal and as discussed above, Appellant Smith principally argues that the district court erred in granting summary judgment on Smith's false arrest and malicious prosecution claims. And in some circumstances, a law enforcement official's non-disclosure could support a false arrest claim, although Smith would need to show that "the magistrate would not have issued the warrant with false information redacted, or omitted information restored." *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997).

And, even without a right under *Brady* to make a claim for non-disclosure without a conviction, Smith could also make a claim for malicious prosecution. Indeed, maintaining a successful malicious prosecution claim requires that the defendant be acquitted, or at least that the criminal proceedings did not result in his conviction. *See* Restatement (Second) of Torts, 653 (1977). But, like false arrest claims, "probable cause is an absolute defense to malicious prosecution." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009).

Thus, a damaged defendant can obtain a remedy for the non-disclosure of evidence, irrespective of his conviction or acquittal. Where non-disclosure of exculpatory evidence leads to a defendant's conviction, he may certainly bring a claim under *Brady*. When the non-disclosure leads to a mistrial or

acquittal, the defendant's opportunity for constitutional remedy lies in claiming malicious prosecution or wrongful arrest, but the non-disclosure in such cases should not support a *Brady* claim.

In sum, allowing *Brady*-based § 1983 claims without a conviction is not compelled by our circuit's case law, conflicts with other circuits' case law and the central purpose of *Brady*, would render *Brady*'s materiality standard significantly less workable, and lacks a limiting principle. I would therefore not allow § 1983 claims for alleged *Brady* violations by a defendant who is ultimately acquitted.

---

D.W. NELSON, Circuit Judge, dissenting:

I respectfully dissent. I disagree with the majority's assessment of the materiality of the suppressed evidence in this case. I also strongly disagree with Judge Gwin's concurrence regarding the scope of *Brady*. These issues will be addressed in turn.

From the start, however, it is important to note that this is a case in which the defendant spent over seventeen months in jail, from the date he was charged in July 2003, through two trials resulting in hung juries, until the trial judge finally dismissed the case on December 14, 2004. Even absent the withheld evidence, seven jurors voted to acquit Smith in the first trial. In the second trial, eleven out of twelve jurors voted to acquit him. The majority holds that the suppressed evidence was immaterial, despite the fact that this evidence could have been used to impeach the credibility of Marilyn Nelson, the witness whose testimony was used to establish Smith's motive for committing the crime in the first place. Absent police misconduct, I believe there is a reasonable probability that Smith would have been acquitted. Therefore, I dissent.

# I

Smith argues that Sergeant Almada violated his due process rights by failing to disclose material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Such evidence is material under *Brady* if (1) it is favorable to the accused either because it is exculpatory or impeaching, (2) it was suppressed by the government, and (3) prejudice ensued as a result. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). In this case, there is no debate as to whether the suppressed evidence was favorable to Smith or suppressed by the State. The only issue is whether the suppression of the evidence was prejudicial.

The Supreme Court has made it clear that prejudice is established "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 280 (internal quotations marks and citations omitted); *see also Banks v. Dretke*, 540 U.S. 668, 698-99 (2004). In addressing this reasonable probability standard, the Court has emphasized that the "adjective is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In other words, "[t]he question is not whether the defendant would *more likely than not* have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. (emphasis added). The relevant question is whether the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Id*. (internal quotations marks and citations omitted). In this case, Sergeant Almada's evidentiary suppression did just that.

Even if we ignore the evidence of the earlier fires, as the majority would have us do, the failure to disclose Nelson's false account of Smith's gloating at the crime scene was prejudicial. In dismissing this evidence as immaterial, the majority contradicts itself by simultaneously insisting that Nelson's testimony was not crucial at Smith's trial and that her testi-

mony helped establish a motive for Smith to commit the arson. Had Almada properly disclosed this evidence, Smith could have used it at trial to impeach Nelson's credibility as a witness. If she was mistaken about Smith's presence at the crime scene after the fire, perhaps she was also mistaken about Smith's comportment during the dispute over the broken consignment item. In other words, the suppressed evidence would have gone a long way towards undermining the other evidence of Smith's alleged motive. Without that, the only connection between Smith and the crime is the peculiar physical evidence found in the incendiary device. Under these circumstances, there is a reasonable probability that the jury in either of Smith's criminal trials would have acquitted him.

This is particularly true when one considers the way the jurors voted in Smith's criminal trials even in the absence of the withheld evidence. A proper application of the reasonable probability standard to this case would have taken into account the fact that the majority of jurors voted to acquit Smith in both of his trials. Even if the majority does not find a reasonable probability of a different outcome in Smith's first trial, where seven jurors voted to acquit him, it is difficult to see how he has not established a reasonable probability regarding his second trial, where eleven out of twelve jurors voted for acquittal.

What is more, the case relied upon by the majority for a finding of immateriality is easily distinguishable from the facts of this case. In *Strickler*, there was far more forensic and physical evidence linking the defendant to the crime, and the witness whose impeachment was at issue offered testimony that was cumulative. 527 U.S. at 292-94. In the case at hand, where the withheld evidence impeaches the credibility of the witness whose testimony was used to establish motive, and eleven jurors out of twelve voted for acquittal even absent the withheld evidence, there is a reasonable probability of a different outcome. In my view, the panel should have held that the evidence Almada failed to disclose was material.

## II

Because I believe the suppressed evidence was material, I would also reach the question of whether *Brady* applies in situations where there has not been a criminal conviction.[1] This is a question of first impression in the Ninth Circuit.

As Judge Gwin's concurrence indicates, he would hold that a Section 1983 suit can never be based on an alleged *Brady* violation if the plaintiff was not ultimately convicted. In order to substantiate this view, the concurrence is forced to rely upon the supposed internal logic of *Brady* itself and the cursory analysis offered by a few other circuits. In effect, the concurrence reduces *Brady* to a *post hoc* remedy for criminal defendants who have been subject to an "unfair trial," *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998), defined narrowly as a trial resulting in a conviction. *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999). This approach is based, however, on the logical fallacy that the lack of a conviction necessitates the conclusion that the trial was "fair" for the purposes of *Brady*. Such a narrow rule would exclude acquittals, hung juries, and even situations in which a judgment of conviction was simply never entered, *id.*, thereby replacing *Brady*'s broad due process pronouncements with a results-oriented test that loses sight of the roles that police and prosecutors play in "shap[ing] a trial that bears heavily on the defendant," whatever the verdict. *Brady v. Maryland*, 373 U.S. 83, 88 (1963).

To further justify this reductive reading of *Brady*, the concurrence contends that drawing the line at criminal convic-

---

[1]Because the majority concludes that the exculpatory evidence withheld from Smith was not material, it is unnecessary to use this case to define the scope of *Brady*. Until we are faced with a case that would otherwise meet the *Brady* requirements, as construed by the majority, we need not decide whether *Brady* applies when an unfair trial results in anything other than a conviction.

tions is the only way to keep the floodgates shut on *Brady*-based Section 1983 claims. This argument ignores, of course, the limits set by the *Brady* requirements themselves: that the evidence was (1) favorable either because it was exculpatory or impeaching, (2) suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). As evidenced by the majority's view of the facts in this case, materiality itself serves sufficiently to restrict the scope of the right afforded by *Brady*. The presence or absence of a conviction merely speaks to the likelihood of showing a violation.

On balance, the precedent in the Supreme Court and in our Circuit cuts against the idea that the right to the disclosure of exculpatory evidence is vitiated simply because a conviction does not result. *See Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); *Brady*, 373 U.S. at 87 (stating that purpose of the rule against suppression of evidence is "avoidance of an unfair trial to the accused"); *United States v. Agurs*, 427 U.S. 97, 104 (1976) (part of the concern is preventing "corruption of the truth-seeking function of the trial process"); *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006) ("The animating purpose of *Brady* is to preserve the fairness of criminal trials.") (citations omitted); *Haupt v. Dillard*, 17 F.3d 285, 287 (9th Cir. 1994) ("The fact that Haupt ultimately was acquitted speaks only to the amount of damages he suffered; it is irrelevant to whether he has a cause of action.").[2]

---

[2]The concurrence tries to distinguish *Haupt* in part because it was based on a Supreme Court decision that has been overruled by *Chavez v. Martinez*, 538 U.S. 760 (2003). However, *Martinez* was based on a reading of the Fifth Amendment's requirement that "[n]o person . . . be compelled *in any criminal case* to be a *witness* against himself." *Id.* at 766 (emphasis in original) (internal quotations omitted). The Supreme Court found a criminal case to commence with the initiation of legal proceedings, not with police questioning. The case does not control the question whether a criminal defendant can assert a constitutional violation where the trial results in acquittal.

*Brady* pursues two interdependent goals: it is a judicially enforced mechanism for *both* protecting the right to a fair trial *and* discouraging misconduct on the part of police and prosecutors. It is hard to imagine protecting this right without also discouraging misconduct. The concurrence would, nevertheless, have us believe that *Brady*'s broad statements about due process can be reduced to a backward-looking check on only the most egregious instances of evidentiary suppression—those that result in a conviction. This approach not only distorts *Brady* and its progeny;[3] it also creates perverse incentives for police and prosecutors who believe they will not successfully convict a particular criminal defendant—in which case it would make sense to suppress evidence, knowing that the suppression would not result in a successful *Brady* claim and the suspect would at least be subject to a lengthy criminal trial.

The fact that a defendant is fortunate enough to escape conviction does not absolve the state of responsibility for the breach of its *Brady* obligations. The individual's right to a fair trial, mandated by the due process clause of the Fifth Amendment, does not hinge on the outcome of criminal proceedings.

In the case at hand, the harm suffered by Smith is obvious, and I cannot conclude that his right to a fair trial was not violated, simply because his trials did not result in a conviction. Again, Smith spent over seventeen months in custody, from the date he was charged in July 2003, through two trials resulting in hung juries, until the trial judge finally dismissed the case on December 14, 2004. Absent police misconduct, Smith might have been acquitted. The two juries knew about

---

[3]Since *Brady* was decided in 1963, the Supreme Court has repeatedly expanded upon its initial insight, holding that the Constitution also requires the disclosure of impeachment evidence, *Giglio v. United States*, 405 U.S. 150, 154 (1972), evidence possessed by the government even if not by the prosecutor, *Kyles*, 514 U.S. at 438, and evidence not specifically requested by the defense, *Agurs*, 427 U.S. at 107.

his dispute with Nelson, but they did not know about Nelson's false identification of Smith. Withholding this evidence is precisely the type of conduct that "undermines confidence in the outcome of [a] trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

Because the majority holds that the suppressed evidence was immaterial, it was right to avoid the broader question regarding the scope of *Brady*. Because I would find that the suppressed evidence was material, and that Smith is entitled to seek recovery on the grounds that the government violated its *Brady* obligations, however, I dissent.