Filed 1/7/25 Lopez v. County of Los Angeles CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VIVEANA LOPEZ et al., | B327598 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19AVCV00601) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen Morgan, Judge.  Affirmed.

Offices of Sanford Jossen, Sanford Jossen for Plaintiffs and Appellants.

Peterson, Bradford, Burkwitz, Gregorio, Burkwitz & Su, Avi Burkwitz, Gil Burkwitz and Avery Canty for Defendants and Respondents.

_____

Appellants Viveana Lopez and Omar Duron Rodriguez, the parents of 18-month-old SLD, filed a civil rights action against the County of Los Angeles and three of its employees, social workers Yesenia Serrano, Vilma Hernandez, and Rina Mejia, alleging that these defendants fabricated allegations supporting a dependency petition. The petition resulted in the juvenile court placing SLD in a foster home, where she died after asphyxiating on a peanut. Lopez and Rodriguez appeal from a judgment entered in favor of the County defendants after the trial court granted their motion for summary judgment. They argue that triable issues of material fact exist on several issues. We disagree, and thus affirm the judgment.

## BACKGROUND

### A.  Introduction

The County Department of Children and Family Services (DCFS) received an anonymous referral about Lopez and Rodriguez getting into an argument with SLD present. DCFS filed reports and a petition with the juvenile court, which ordered SLD detained and suitably placed away from the parents. DCFS placed SLD in a foster home where, four months later, she asphyxiated on a peanut and died.

Lopez and Rodriguez represent that when the foster parents were not watching, another foster child gave SLD trail mix, and she asphyxiated in her sleep. They sued the foster parents and foster agency for wrongful death, and that litigation is concluded. The foster parents and foster agency are not part of this appeal.

Lopez and Rodriguez also sued the County and three of its employees for statutory and civil rights violations. The primary

thrust of their complaint against the County and its employees is not that they caused SLD's death, but that they caused her wrongful detention, which ultimately led to her death.

## B.    Referrals and Reports
### 1.    Prior Incidents

Lopez had three other children, M.C., A.P., and H.P., with two other fathers. Lopez lost parental rights to M.C. in 2010 following a domestic violence dispute that occurred in the child's presence, and lost custody of A.P. and H.P. in 2015. These children then lived with their fathers.

SLD was born on March 13, 2017. On September 12, 2017, an anonymous caller reported to DCFS that SLD was riddled with rashes and that Lopez was constantly intoxicated. DCFS social worker Shannen Gonzalez investigated. Gonzalez found Lopez to be lucid and appropriate with SLD, and although she tested positive for marijuana, she had a medical marijuana card. Lopez tested negative for alcohol and other drugs. Gonzalez observed that the home was clean and SLD had no rashes, and the father of A.P. and H.P. reported he had no "worries or concerns" about Lopez. Gonzalez concluded the allegations were unfounded and recommended that the referral be closed because the "situation [was] stabilized," stating: "At this time CSW has not found children to be in imminent risk and does not require further DCFS and/or court involvement." DCFS closed the referral.

### 2.    The March 14, 2018 Incident

On March 15, 2018, an anonymous caller to the County's Child Protective Hotline reported that on March 14, Lopez and

Rodriguez were involved in a domestic dispute in the presence of SLD. According to the caller, Lopez asked Rodriguez to leave the house but he refused. When she tried to leave with SLD, he pushed her shoulder. She left with SLD in her car but Rodriguez pursued in his car, driving erratically. The caller reported that Lopez ultimately stopped "and began running on foot until she flagged down" police. Rodriguez was arrested.

DCFS assigned the matter to Serrano, an Emergency Response Unit social worker, who was supervised by Mejia.

Serrano reviewed prior DCFS investigative summaries and dependency court proceedings regarding Lopez and her other children, M.C., A.P., and H.P., and interviewed Lopez, Rodriguez, SLD's maternal grandmother, and A.P., H.P., and their father.

### a.     Police Report

Serrano also received a police report that was ultimately excluded in the proceedings below due to lack of authentication. Although the report was excluded, we will outline some of the contentions it contained, not for their truth but for their effect on Serrano's decisionmaking.

The report stated that Lopez, the "victim," reported that in the March 14 incident, Rodriguez, the "dominant aggressor," "struck[] her on her right shoulder area with open hand" while SLD was present. The report continued:

"The victim said that she exited her apartment and left in her vehicle with her child to get away from the suspect, but the suspect entered his vehicle and followed her. . . . [W]hile she was driving, [Rodriguez] was in his vehicle, driving behind her flashing his headlights at her causing a hazard and a very dangerous situation as she was attempting to get away from

4

him. . . . [W]hile driving, she called the suspect and told him to stop following her and to stop flashing his lights at her because she feared that she was going to have an accident with their child inside the vehicle. [¶] The victim said that when the suspect continued to follow her, she stopped her vehicle and parked. . . . [S]he exited her vehicle and fled on foot with her child. . . . [T]he suspect parked his vehicle behind her vehicle and followed her on foot, until they flagged down a San Fernando PD patrol unit. [¶] When the victim found out that the suspect was going to be arrested, she changed her story. The victim originally said that she was struck on the chest, but later said that the suspect only touched her very lightly on the right shoulder area. The victim said that she was not in fear, however, she will go to the courthouse to obtain a restraining order against the suspect. [¶] The victim appeared to have been crying and was very upset. [She] was very distraught and was genuinely concern[ed] about her safety and the safety of her child."

Police also interviewed Rodriguez, and detailed his statement:

"Rodriguez said that on 03/14/18 at approximately 1930 hours he was inside the motel room with the victim and their child when an argument ensued over money. The victim became angry, got on top of the bed to prevent him from getting close to [SLD]. The victim then kicked him twice on the chest. Rodriguez said that he did not fall to the ground, and was able to hold her leg the second time. . . . [Lopez] then got down from the bed and kicked him on his testicles. [¶] Rodriguez said that the victim grabbed their child from the bed and attempted to leave. . . . [He] followed the victim in his vehicle because he . . . feared for the safety of his child."

### b.      Other Incidents

Serrano learned that a 2010 dependency petition alleged Lopez engaged in a violent altercation with her brother (a minor), in the presence of M.C., striking her brother with a hot frying pan, which caused him first- and second-degree burns.  M.C. was placed in the custody of her father, and Lopez failed to comply with dependency court orders and ultimately failed to reunify with the child.

Serrano learned A.P.'s and H.P.'s father obtained custody of these children after dependency proceedings and filed a temporary restraining order against Lopez.  The court ordered Lopez to attend a batterer prevention program, which she failed to do.

Serrano learned that in September 2017, a referral was generated alleging Lopez abused drugs and neglected SLD. Serrano contacted Gonzalez, whose investigation into this referral revealed no signs of neglect.  Gonzalez told Serrano that Lopez refused to provide information about Rodriguez, denied any domestic violence between them, and reported she had no contact with Rodriguez, although an LAPD report indicated he was at her home on August 1, 2017.  Gonzalez stated she submitted a Prevention and Aftercare referral for Lopez upon closing the DCFS referral.

Serrano interviewed Lopez, who denied any domestic violence between herself and Rodriguez during the March 14 incident, and admitted she did not take advantage of Gonzalez's Prevention and Aftercare referral.  Lopez reported that Rodriguez had returned home from his arrest.

Serrano interviewed Rodriguez, who admitted he was in contact with Lopez at the time of the September 2017 referral,

contradicting Lopez's statement to Gonzalez that she had no contact with Rodriguez at that time.

Neither Lopez nor Rodriguez provided information of relatives who might be able to take temporary custody of SLD.

## C.    Detention Proceedings
### 1.    Warrant Request

Serrano concluded that Lopez and Rodriguez had significantly underplayed the nature and circumstances of their dispute and that both were active participants in the domestic violence that occurred during the March 14 incident. She consulted with Mejia and determined that there was a high risk of harm to SLD due to Lopez's prior referral history and failure to reunify in prior DCFS cases, her dishonest statements to social workers about domestic violence and the March 14 incident, her "history of aggressive behavior and failure to comply with court orders or complete any program," and the fact that Rodriguez had been arrested for intimate partner battery. They determined SLD should be removed from both parents.

On April 10, 2018, four weeks after the March 14 incident, Serrano, crediting DCFS records and the March 14 police report, filed a request for a warrant for temporary custody of SLD. In the request, Serrano asserted under penalty of perjury in a Statement of Cause that she had received information that:

(1) Lopez told police about the March 14 incident, and said that Rodriguez "struck[] her on her right shoulder with an open hand" while SLD was present;

(2) Rodriguez told police that Lopez "assaulted" him "approximately ten times during the course of their relationship," and in the March 14 incident "kicked" him several times and,

7

after picking up SLD, "pushed him out of the way" to leave their residence;

(3) Police determined Rodriguez, not Lopez, was the dominant aggressor in the dispute, but charges against him were ultimately dismissed;

(4) Lopez had been a subject in other DCFS referrals, many when she was a minor and the alleged victim of neglect. Although several more recent referrals named her as the offending parent, most of those were closed as "unfounded";

(5) Lopez admitted to smoking marijuana and had a medical marijuana card that allowed her to do so, but did not smoke in SLD's presence; (Serrano did not report marijuana use as a basis for SLD's removal); and

(6) SLD's maternal grandmother reported that Lopez was a good mother and SLD had a strong attachment to her.

### 2. Detention Proceedings

Based on Serrano's request, on April 11, 2018, the juvenile court found there was probable cause to believe that SLD was a person described by Welfare and Institutions Code section 300, and authorized DCFS to take temporary custody of the child.[1]

### 3. Temporary Placement

Because neither Lopez nor Rodriguez had provided information as to relatives who could be considered for placement, DCFS's technical assistance team contacted foster

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

family agencies, which informed DCFS that a foster home was available.

On April 12, 2018, Serrano placed SLD in the foster family home of Emma Onofre and her husband, both of whom had been approved and certified by the foster family agency Ninos Latinos Unidos, Inc. Before leaving the child with them, Serrano verified that the Onofres had a suitable room and crib for SLD.

### 4. Detention Report

On April 13, 2018, Serrano filed a detention report with the court. She reported that Lopez: (1) denied Rodriguez hit or pushed her on March 14, 2018, but had merely "tapped her shoulder to ask where she was going"; (2) denied running on foot with SLD to flag down police; and (3) stated that she informed police that Rodriguez did not push or hurt her.

Serrano reported that Rodriguez stated he and Lopez never argued, and he denied that he pushed or even touched Lopez in the March incident and denied that she ran on foot with SLD to flag down police. On the contrary, Rodriguez called police to help defuse the situation.

### D. Jurisdiction and Adjudication Proceedings
### 1. Dependency Petition

On April 12, 2018, Hernandez drafted a dependency petition based on Serrano's reports, alleging: (1) Lopez had a history of domestic violence and engaged in a physical altercation with Rodriguez in SLD's presence; (2) M.C., SLD's sibling, was a prior dependent of the court due to Lopez's physically abusive conduct; and (3) Lopez's marijuana use and her and Rodriguez's

physical altercation on March 14, 2018, placed SLD and her siblings at risk of serious physical harm.

### 2. Adjudication Proceedings
#### a. Detention Hearing

On April 16, 2018, the court held a detention hearing. Lopez and Rodriguez appeared, were appointed counsel, and denied the allegations of the petition. The court found that prima facie evidence existed that SLD was at risk and DCFS had made reasonable efforts to prevent removal. It ordered that SLD remain detained from her parents and granted them monitored visitation.

#### b. Alternative Placement Possibility

On April 17, 2018, Lopez informed Serrano for the first time that a paternal aunt in Bakersfield could take SLD. On April 24, 2018, Serrano submitted a Resource Family Assessment Intake Request to initiate the process to have the aunt considered for placement.

But, on May 7, 2018, Lopez asked a continuing services social worker to leave SLD with the Onofres, with whom she appeared to be well cared for and happy.

#### c. Adjudication Hearing

On June 6, 2018, the court held an adjudication hearing. Lopez and Rodriguez, represented by counsel, pleaded no contest to the allegations in DCFS's dependency petition. To wit, that plaintiffs engaged in a physical altercation in the presence of SLD, that Lopez assaulted Rodriguez on numerous prior occasions, that SLD's sibling is a former dependent of the juvenile

court due to Lopez's physically abusive conduct, and that plaintiffs' violent conduct placed SLD and her siblings at risk of serious physical harm.

The court stated that "per the No Contest Plea[s]," the petition was amended and sustained, as follows:

"[L]opez and . . . Rodriguez . . . have a history of engaging in physical altercations including in the presence of [SLD]. On 03/14/2018, the mother and [Rodriguez] engaged in a physical altercation. The mother left in the mother's vehicle with the child [SLD] and [Rodriguez] followed the mother in [his] car. On numerous prior occasions, the mother assaulted [Rodriguez]. The children's sibling . . . is a former dependent of the Juvenile Court due to the mother's physically abusive conduct. Such violent conduct on the part of the mother and [Rodriguez] endangers the child's physical health and safety and places the child, [SLD] and the child's siblings . . . at risk of serious physical harm."

The court declared SLD to be a dependent of the court and found, "by clear and convincing evidence," that it was "reasonable and necessary to remove the child from the parents . . . because there is a substantial danger to the physical health, safety, protection, or physical or emotional well-being . . . of the child, and there are no reasonable means by which the child's physical health can be protected, without removing the child from the home and the care, custody, and control of [the parents]." The court found "it would be detrimental to the safety, protection, or physical or emotional well-being . . . of the child to be returned [to the parents]," and DCFS "made reasonable efforts to prevent removal but there [were] no services available to prevent further detention."

11

The court ordered SLD removed from the care, custody and control of her parents and placed with DCFS, with monitored visitation.

**E.    Placement and SLD's Death**

In the four months during which SLD was in foster care, DCFS social workers conducted seven face-to-face visits, finding her to be clean, happy, and dressed appropriately, with no visible marks or bruises.  The Onofre home was also observed to be clean.  Foster Family Agencies social workers checked on SLD in the Onofre home on a weekly basis and did not document any concerns.

DCFS monitored visits between Lopez and SLD.  All went well, with "great interaction between them."

DCFS reported that in all interactions between Lopez and SLD in this case, social workers observed that Lopez was a creative, loving, attentive mother, and SLD was thriving and happy in her care.

On July 17, 2018, at approximately 7:00 a.m., SLD's foster mother found SLD in her crib deceased.  The coroner listed the cause of death as asphyxia due to choking on half a peanut lodged in SLD's trachea, obstructing her airway.

**F.    Complaint**

Lopez and Rodriguez, both individually and as successors in interest to SLD, filed a lawsuit against respondents (the County, Serrano, Mejia, and Hernandez), NLU (the foster agency), and the Onofres.  In the operative third amended complaint, Lopez and Rodriguez asserted three causes of action against the County defendants, here respondents on appeal:  (1)

12

breach of mandatory duties; (2) violation of civil rights under 42 USC 1983; and (3) violation of civil rights "pursuant to *Monell*."[2] Lopez and Rodriguez alleged they were "harmed by the removal of their daughter," by "the subsequent events which led to her death," and by "the loss of their daughter."

### 1.    Factual Allegations

The operative complaint alleged that on March 14, 2018, Lopez and Rodriguez "got into an argument," and Lopez "fled the home with [SLD]." Police were called, and determined that Rodriguez was the "dominant aggressor and had jeopardized the safety of [Lopez] and SLD by not allowing them to leave and seek shelter. The police report characterized the incident as a domestic violence incident in which [Lopez] was the victim and stated, 'The victim [Lopez] appeared to have been crying and was very upset. The victim was very distraught and was genuinely concern[ed] about her safety and the safety of her child.' " (Italics and some quotation marks omitted.)

The operative complaint alleged that Lopez denied to Serrano that any physical altercation had occurred, and no evidence suggested SLD had been harmed. It also alleged that the County defendants filed a removal request, detention report, and dependency petition, all of which were baseless; this resulted

---

[2] *Monell v. Department of Social Services* (1978) 436 U.S. 658. Plaintiffs' first cause of action against the County, Serrano, Mejia, and Hernandez is titled "Breach of Mandatory Duties/Violation of Statute/Negligence Per Se." In their complaint and briefs on appeal, however, Lopez and Rodriguez assert only that the County defendants breached mandatory duties.

13

in SLD being placed with the Onofres, ultimately causing her death.

### 2. Mandatory Duties

Lopez and Rodriguez alleged the County defendants owed mandatory duties: to protect SLD and act in her best interests pursuant to sections 202, 202, subdivisions (a)-(b), 300.2, 361, subdivision (c)(1), 361.2, subdivision (a), 361.3, subdivision (a)(8), 361.21, subdivision (e); to provide a safe home for the child pursuant to section 396; and to preserve the family pursuant to sections 202, 300.2, and 361. They alleged the County defendants failed to fulfill these mandatory duties by presenting false allegations to the court, failing to present exculpatory evidence, failing to properly screen the Onofres or monitor SLD's placement, and failing to seek return of SLD to Lopez, the non-offending parent.

### 3. 42 USC § 1983

Lopez and Rodriguez alleged these failings constituted their "Constitutional rights to familial relationships without governmental interference," and violated their parental rights pursuant to *Monell v. Department of Social Services* (1978) 436 U.S. 658 (*Monell*).

### 4. *Monell* Liability

Regarding their *Monell* claim, Lopez and Rodriguez alleged that in order to obtain federal and state funds, the County adopted unofficial policies and had widespread and longstanding practices of detaining children in the absence of exigent circumstances, or other legal bases, and failing to return custody

14

of children to non-offending parents. In support of this endeavor, they alleged that the County adopted a policy to mislead the superior court in warrant applications by failing to include exculpatory evidence when a child may be detained from a non-offending parent as a means of intimidating and coercing parents into pleading no contest to charging allegations.

Specifically, they alleged the County had no written policy for analyzing, investigating, or presenting evidence as to whether a child should be removed from her parents or returned to them, but did have a policy of removing children from their families absent exigent circumstances, placing them with nonfamily members, and failing to return them to their families within a reasonable time.

## G.    Summary Judgment

The County defendants moved for summary judgment, arguing they duly investigated allegations raised in the dependency referral and determined that placing SLD with the Onofres would be in her best interests. They supported the opposition with declarations from Serrano, Hernandez, and Mejia detailing their respective roles in the investigations and filings described above.

Hernandez declared that although she prepared the dependency petition, she did not prepare the warrant package or submit a statement of cause or detention report.

Mejia declared that she, as Serrano's supervisor, did not perform the investigation or draft the statement of cause, application for removal, or declaration in support of the removal, and did not sign the warrant request. She merely relied on the

15

information that Serrano provided from her investigation, and signed the detention report based on this information.

The County defendants argued that Serrano's statement of cause supporting her application for a detention warrant was accurate, as it was supported by the information upon which she relied—the March 14, 2018 police report and interviews with Lopez and Rodriguez. Serrano accurately represented that: plaintiffs engaged in a domestic violence incident while SLD was present, in which Lopez struck and kicked Rodriguez several times; Lopez had been the subject of another DCFS case; Lopez admitted to smoking marijuana; SLD's maternal grandmother reported that Lopez was a good mother; and the charges against Rodriguez following the domestic violence incident were ultimately dropped.

The County defendants argued that no evidence suggested Hernandez or Mejia investigated or corroborated the factual allegations of abuse supporting Serrano's warrant application, or intentionally misrepresented any facts to the dependency court. On the contrary, the undisputed evidence was that Hernandez's role was limited to filing a juvenile petition with the court, and Mejia only signed the detention report.

Lopez and Rodriguez opposed the motion, essentially arguing that the dependency case was meritless and that DCFS wrongfully failed to return SLD to Lopez. Lopez declared she never told police that Rodriguez struck her, and in the March 14 Incident "nothing happened except a 'nudge.'" Lopez and Rodriguez admitted that DCFS frequently monitored SLD in her placement with the Onofres.

Lopez and Rodriguez offered in opposition the declaration of Paula Rhode, an expert in child abuse and neglect

16

investigations. Rhode declared Serrano's investigation of the March 15, 2018 dependency referral was deficient in several respects, and SLD should not have been detained.

The court found there were no triable issues of material fact as to plaintiffs' causes of action for breach of mandatory duties and deprivation of familial rights. The court on its own motion ordered the *Monell* claim stricken for failure to identify any person with County policymaking authority, or to identify specific evidence of the existence of any alleged policy.

Lopez and Rodriguez appeal from the resulting entry of judgment.

## DISCUSSION

On appeal, Lopez and Rodriguez contend the County defendants submitted false information to the juvenile court that "feature[ed] unsubstantiated information, mischaracterizations, hearsay and omissions of fact," and that no evidence justified SLD's detention. Therefore, they argue, triable issues of material fact exist as to why SLD was detained.

### A. Breach of Mandatory Duties

The first cause of action against the County defendants is for breach of several sections of the Welfare and Institutions Code, which Lopez and Rodriguez argue set forth mandatory duties. On appeal, Lopez and Rodriguez defend this cause of action only as to breach of sections 309 and 319. We therefore deem the action abandoned as to breach of any other statute.

#### 1. Preliminary Considerations

Preliminarily, we note that although the first cause of action against Serrano, Mejia, and Hernandez is titled "Breach of

17

Mandatory Duties/Violation of Statute/*Negligence Per Se*" (italics added), Lopez and Rodriguez do not separately claim these defendants are liable for negligence per se. We therefore deem any separate negligence claim to be forfeited.

Furthermore, we are aware of no right of action against a private individual for breach of mandatory duties. Lopez and Rodriguez allege that Serrano, Mejia, and Hernandez "breached mandatory duties" within the meaning of CACI No. 423. But jury instructions are not the law and do not constitute binding authority. (See *People v. Mojica* (2006) 139 Cal.App.4th 1197, 1204, fn. 4 [pattern jury instructions are not the law and are not binding].)

CACI No. 423, titled "Public Entity Liability for Failure to Perform Mandatory Duty," which itself applies only to public entities, tracks Government Code section 815.6, which likewise applies only to public entities. It provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

We invited supplemental briefing from plaintiffs to identify a right of action against an individual for breach of mandatory duties.

Lopez and Rodriguez responded with a list of several Government Code statutes but only one, section 815.6, relates to breach of a mandatory duty, and as noted above, that section pertains only to public entities. They also cited *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125 and *Akey v. Placer County* (E.D. Cal. Sept. 1, 2015) 2015 U.S. Dist. LEXIS 116586, but those cases likewise pertain only to the liability of public entities for

18

breach of mandatory duties.  Finally, plaintiffs cited *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, which has nothing to do with mandatory duties.

We conclude no triable issue exists as to a private individual's liability for breach of mandatory duties.

### 2.    The County's Mandatory Duties
#### a.    Legal Principles

The County, however, may be held liable for breach of mandatory duties.

"Under the California Government Claims Act (Gov. Code, § 810 et seq.), governmental tort liability must be based on statute.  'Except as otherwise provided by statute:  [¶] . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.' " (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 179.)

Government Code section 815.6 provides a statutory exception to the general rule of public entity immunity.  (*B.H. v. County of San Bernardino*, *supra*, 62 Cal.4th at p. 179.)

"Government Code section 815.6 has three elements that must be satisfied to impose public entity liability:  (1) a mandatory duty was imposed on the public entity by an enactment; (2) the enactment was designed to protect against the particular kind of injury allegedly suffered; and (3) the breach of the mandatory statutory duty proximately caused the injury.  Even when a duty exists, California has enacted specific immunity statutes that, if applicable, prevail over liability provisions.  [Citation.]  The first question always is whether there is liability for breach of a mandatory duty.  [Citation.]  If there is no liability, the issue of immunity never arises." (*B.H. v. County of San Bernardino*, *supra*, 62 Cal.4th at p. 179.)

19

### b. Summary Judgment

A trial court properly grants summary judgment " 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  (Code Civ. Proc., § 437c, subd. (c).)  A defendant may establish his right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action.  ([§] 437c, subd. (p)(2).)"  (*Neiman v. Leo A. Daly Co.* (2012) 210 Cal.App.4th 962, 967.)  "Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action.  [Citation.]  A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' "  (*Ibid.*)

On appeal, we apply an independent standard of review to determine whether a trial is required—whether the evidence favoring and opposing the summary judgment motion would support a reasonable trier of fact's determination in the plaintiff's favor on the cause of action or defense.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  In doing so we view the evidence in the light most favorable to the party opposing summary judgment.  (*Id.* at p. 843; *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.)  We accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them.  (*Spitzer v. The Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385-1386.)

### c.    Application

Lopez and Rodriguez contend triable issues exist as to whether the County is liable for breach of the mandatory duties set forth by subdivision (a) of section 309 and subdivision (h)(2) of section 319.

### i.    Sections 309 and 319

Subdivision (a) of section 309 states, in pertinent part: "Upon delivery to the social worker of a child who has been taken into temporary custody under this article, the social worker shall immediately investigate the circumstances of the child and the facts surrounding the child's being taken into custody and attempt to maintain the child with the child's family through the provision of services.  The social worker shall immediately release the child to the custody of the child's parent, guardian, Indian custodian, or relative . . . unless . . . [¶] . . . [¶] . . . [c]ontinued detention of the child is a matter of immediate and urgent necessity for the protection of the child and there are no reasonable means by which the child can be protected in their home or the home of a relative."

Subdivision (h)(2) of section 319 provides, in pertinent part: "Relatives shall be given preferential consideration for placement of the child."

Neither statute mandates that a minor be returned to a parent or placed with a relative.  They mandate only that an investigation be conducted, that a child be returned to a parent if no contrary immediate and urgent necessity for the protection of the child exists, and that relatives be given preferential consideration in placement.

21

In support of its motion for summary judgment, the County proffered evidence that it investigated the March 15, 2018 referral pursuant to sections 309 and 319 and determined that placing SLD with the Onofres would be in her best interests. This evidence shifted the burden to plaintiffs to establish the existence of a triable issue of material fact.

Lopez and Rodriguez did not dispute that DCFS investigated the referral; they complain that the investigation was defective, that SLD was not immediately returned to Lopez and, if she could not be returned to Lopez, that SLD's relatives were not given preferential consideration for placement. Lopez and Rodriguez do not contend that the County could have unilaterally returned SLD to Lopez after she had been placed with the Onofres, as to do so would have violated the juvenile court's detention and adjudication orders.

### ii.  No Mandatory Duties

Although sections 309 and 319 mandate activities for purposes of the Welfare and Institutions Code, such directives do not set forth mandatory duties under Government Code section 815.6.

"Courts have delineated what is necessary to establish a mandatory duty.  'First and foremost, . . . the enactment at issue [must] be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken.'  [Citation.]  'It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function *if the function itself involves the exercise of*

*discretion.'*" (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 348 (*State Dept. of State Hospitals*).)

"Whether an enactment imposes 'a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts.' [Citation.] The enactment's 'language "is, of course, a most important guide in determining legislative intent, [but] there are unquestionably instances in which other factors will indicate that apparent obligatory language was not intended to foreclose a governmental entity's or officer's exercise of discretion." ' [Citation.] For example, the word 'shall' is 'mandatory' for purposes of the Welfare and Institutions Code. [Citations.] 'However, as we have emphasized, this term's inclusion in an enactment does not necessarily create a mandatory duty' within the meaning of Government Code section 815.6." (*State Dept. of State Hospitals*, *supra*, 61 Cal.4th at p. 349.)

"A mandatory duty is created only when an enactment requires an act that is clearly defined and not left to the public entity's discretion or judgment. [Citation.] Such an act is mandated only to the extent of the enactment's precise formulation. When the enactment leaves implementation to an exercise of discretion, 'lend[ing] itself to a normative or qualitative debate over whether [the duty] was adequately fulfilled,' an alleged failure in implementation will not give rise to liability." (*State Dept. of State Hospitals*, *supra*, 61 Cal.4th at p. 350.)

### (a). Section 309

Here, section 309 obligates a social worker to "investigate" the circumstances surrounding a child's being taken into custody,

"attempt to maintain" the child with the child's family through the provision of services, and "release the child to the custody of the child's parent" unless continued detention is immediately and urgently necessary to protect the child, and no reasonable alternative exists.

"The nature of the investigation to be conducted and the ultimate determination of suitability of adoptive parents [by social workers] bear the hallmarks of uniquely discretionary activity." (*Jacqueline T. v. Alameda County Child Protective Services* (2007) 155 Cal.App.4th 456, 466.) To conduct an investigation, an investigator must identify pertinent issues, disregard irrelevant ones, and marshal facts necessary to reach an informed conclusion. To conclude whether a child should be placed within the family, for example, or returned to the child's parents, a dependency investigator must evaluate the existence and nature of any risks to the child, weigh the likelihood and degree of potential harm, assess the availability and efficacy of any protective measures, and determine whether placement within the family or with parents would chart a beneficial course through and among the risks.

Thus, "the choice of a foster home for a dependent child is a complex task requiring the consideration and balancing of many factors to achieve statutory objectives. County social workers [must] evaluate[] numerous subjective factors in determining what they believe[] to be the appropriate placement." (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1464 [foster home placement is a discretionary decision].)

Neither the Welfare and Institutions Code nor any regulation defines the exact parameters of a dependency investigation nor mandates any particular conclusion. (See

24

*Ronald S. v. County of San Diego* (1993) 16 Cal.App.4th 887, 897 ["The decisions made in the adoption process are by nature highly subjective. . . . There is no way that the following of forms or rules or agency procedures could transmute this most subjective decisionmaking process into a ministerial act"].) The only precise requirement is that the social worker must pursue the best interests of the child. How exactly she does this is a matter of discretion and judgment.

Section 309 thus obligates a social worker to perform a discretionary function—investigate a dependency referral and identify a suitable placement for the child, preferring placement with parents. These tasks, while obligatory, are not mandatory duties within the meaning of Government Code section 815.6.

## (b).  Section 319

If a dependent child cannot be placed within the family or with parents as prescribed by section 309, section 319 prescribes a secondary preference: The County must prefer placement with relatives. The statute mandates no specific way this preference must be effectuated.

This relative preference is different only in degree, not quality, from the preference described in section 309. The investigation and decisions that go into such a placement therefore involve the same exercises of discretion and judgment. As discussed above, the statutory obligation to conduct such an investigation, and effectuate such a preference, does not set forth a mandatory duty within the meaning of Government Code section 815.6.

### iii.    Conclusion

Because the individual defendants cannot be held liable for breach of mandatory duties under any theory plaintiffs assert, we hold that the trial court correctly concluded no triable issue exists as to them for breach of mandatory duties.

Because sections 309 and 319 create no mandatory duty to place a child either with Lopez and Rodriguez or relatives, no triable issue exists as to the County's liability under Government Code section 815.6.  Given this holding, we need not reach the issues of breach or causation, nor of whether Serrano, Hernandez, or Mejia enjoyed civil immunities under Government Code section 821.6 or were barred from immunity under Government Code section 820.21.  (See *B.H. v. County of San Bernardino*, *supra*, 62 Cal.4th at p. 179 ["If there is no liability, the issue of immunity never arises"].)


## B.    Violation Of Civil Rights Under 42 USC § 1983

Lopez and Rodriguez contend triable issues exist as to whether County defendants deprived them of constitutionally guaranteed familial rights within the meaning of 42 USC § 1983 (hereafter § 1983) by removing SLD from their custody based on fabricated evidence.


### 1.    Legal Principles

Title 42 USC § 1983 provides, in pertinent part:  "Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by

26

the Constitution and laws, shall be liable to the party injured in an action at law . . . for redress . . . ."

Title 42 USC § 1983 was enacted " 'to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.' " (*Modacure v. B&B Vehicle Processing, Inc.* (2018) 30 Cal.App.5th 690, 693.) It does not "create substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by government officials." (*Jones v. Williams* (9th Cir. 2002) 297 F.3d 930, 934.)

In a § 1983 action, the plaintiff must establish that a person acting under the color of state law wrongfully deprived her of a federal right. (*Catsouras v. Department of California Highway Patrol* (2010) 181 Cal.App.4th 856, 890.) For example, removal of a child from the custody of her parents without a warrant, parental consent, or evidence that the child was in imminent danger of serious bodily injury is actionable under § 1983. (*Jones v. County of Los Angeles* (9th Cir. 2015) 802 F.3d 990, 1000.) "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." (*Keates v. Koile* (2018) 883 F.3d 1228, 1235-1236.)

If, however, a detention *is* by court warrant, the plaintiff must establish that the warrant affidavit contained material misrepresentations or omissions that were made intentionally or with reckless disregard for the truth. (*Bravo v. City of Santa Maria* (9th Cir. 2011) 665 F.3d 1076, 1083.) Materiality is a question of law for the court to determine. (*Ewing v. City of Stockton* (9th Cir. 2009) 588 F.3d 1218, 1224.)

27

Here, the County offered evidence that Serrano duly investigated allegations raised in the dependency referral and determined that placing SLD with the Onofres would be in her best interests. She then prepared a request for a detention warrant, supported by a statement of cause. Serrano declared that for the statement of cause, she relied on a police report and interviews with Lopez, Rodriguez, Lopez's mother, and Gonzalez, a social worker who had handled a prior dependency referral. From these sources, Serrano understood that (1) Lopez and Rodriguez engaged in domestic violence in SLD's presence; (2) Lopez underplayed the violence and denied there was a problem; (3) Lopez's marijuana use was not a problem; and (4) Lopez's mother thought Lopez was a good parent. Serrano declared she relayed these facts to the court in her statement of cause.

Hernandez and Mejia both declared they had no role in drafting the statement of cause.

This evidence demonstrated that Lopez and Rodriguez could not establish their § 1983 claim because the statement of cause given to the juvenile court to achieve SLD's detention contained no intentional fabrications.

This showing shifted the burden to Lopez and Rodriguez to demonstrate the existence of a triable issue of material fact.

They failed to do so. In opposition to the motion, plaintiffs took great issue with Serrano's investigation and report, arguing they relied on unreliable evidence and hearsay, omitted material facts, and failed to credit Lopez's contrary narrative. For example, they argued that contrary to the police report, Lopez never told police that Rodriguez struck her, and in the March 14 incident "nothing happened except a 'nudge.'"

28

None of this evidence established that Serrano, Hernandez, or Mejia submitted a warrant affidavit to the court that contained material misrepresentations or omissions that were made intentionally or with reckless disregard for the truth. At best, this evidence indicated Serrano's statement of cause was inaccurate or incomplete. But no evidence showed that any inaccuracy or omission was intentional.

We therefore conclude the trial court properly granted summary judgment on plaintiffs' § 1983 claim.

## C.   *Monell*

The trial court did not rule on the County defendants' motion for summary judgment as to the *Monell* claim. Instead, on its own motion, it ordered the claim stricken as improper because in it, Lopez and Rodriguez: (1) failed to identify any policymaker; and (2) failed to identify evidence of any offending policy.

Lopez and Rodriguez do not contest the procedure by which the trial court disposed of their *Monell* claim. Instead, they contend their allegations sufficed as to the County. They concede that Mejia, Serrano, and Hernandez cannot be held liable on a *Monell* claim.

### 1.   Legal Principles

A municipality may be held liable under a claim brought under § 1983 only when the municipality inflicts an injury; it may not be held liable under a respondeat superior theory. (*Monell*, *supra*, 436 U.S. at p. 694; *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 829 (*Venegas*).)

At least two routes can lead to the conclusion that a municipality has inflicted a constitutional injury.  First, a plaintiff can show that a municipality itself violated someone's rights or that it directed its employee to do so.  (*Board of Com'rs of Bryan Cty. v. Brown* (1997) 520 U.S. 397, 404.)  To show that the municipality violated someone's rights or instructed its employees to do so, a plaintiff can prove that the municipality acted with "the state of mind required to prove the underlying violation," just as a plaintiff does when he or she alleges that a natural person has violated his federal rights.  (*Id.* at p. 405.)  For example, in *Monell*, it was alleged the city had a policy of discriminating against pregnant women in violation of the Fourteenth Amendment.  (*Monell*, *supra*, 436 U.S. at p. 658.)

Alternatively, a plaintiff can demonstrate that a municipality is responsible for a constitutional tort committed by its employee, even though it did not direct the employee to commit the tort.  (*Board of Com'rs of Bryan Cty. v. Brown*, *supra*, 520 U.S. at pp. 406-407; *City of Canton v. Harris* (1989) 489 U.S. 378, 387.)  Under this theory of liability, a plaintiff can establish that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.  (*Canton*, at pp. 387-389.)  Because a municipality may not be held liable under a theory of respondeat superior, a plaintiff must show that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation.  (*Id.* at p. 387.)  To prove deliberate

30

indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation. (*Farmer v. Brennan* (1994) 511 U.S. 825, 841.) Compared to the more direct route to municipal liability discussed above, "much more difficult problems of proof" are presented in a case where a municipal employee acting under a constitutionally valid policy violated someone's rights. (*Board of Com'rs of Bryan Cty.*, at p. 406.)

In *City of Canton v. Harris, supra*, 489 U.S. at page 388, the United States Supreme Court held that the "inadequacy of police training" may result in a municipality being held liable under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." An omission, such as failure to train, reflects a "deliberate" or "conscious" choice on a municipality's part and, as such, may constitute a policy or custom creating liability for the municipality. (*Id.* at pp. 388-389.) But mere allegations that an existing training program constitutes a "policy" for which the municipality is responsible will not suffice. (*Id.* at p. 389.) As explained by the *Canton* Court: "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. [Citations.] It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular

injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." (*Id*. at pp. 390-391.)

### 2. Application

Here, Lopez and Rodriguez allege that the County violated their constitutional rights by adopting informal procedures to detain dependent children from non-offending parents without adequate investigation or evidence and in the absence of exigent circumstances.

The claim fails for two simple reasons.

First, neither DCFS nor the County detains dependent children, the superior court does. The superior court is a state entity. A state cannot be held liable under § 1983. (*Venegas*, *supra*, 32 Cal.4th at p. 829 ["*states and state officers* sued in their official capacity are not considered persons under section 1983 and are immune from liability under the statute by virtue of the Eleventh Amendment and the doctrine of sovereign immunity"].) The County may be held liable under § 1983 only for intentionally misleading the court to detain children.

Second, as discussed above, no triable issue exists as to whether Lopez and Rodriguez suffered a constitutional violation. Without such a violation, the County can have no *Monell* liability. (See *City of Los Angeles v. Heller* (1986) 475 U.S. 796, 799 ["If a person has suffered no constitutional injury . . . the fact that the

departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point"].)

We conclude that Lopez and Rodriguez's *Monell* claim is improper because it relies on the incorrect proposition that the County, not the State of California, detained SLD. The claim was thus properly stricken. We further conclude that even had the claim not been stricken, no triable issue exists as to whether the County, through its deliberate omissions, was responsible for a constitutional violation committed by its employees.

Because Lopez and Rodriguez do not challenge the procedure by which the trial court disposed of their *Monell* claim, we need not decide whether it was appropriate to strike the claim on the court's own motion.

Given the above holdings, we need not decide whether Lopez and Rodriguez are collaterally estopped from challenging the social workers' conduct or whether their § 1983 claim is barred under *Heck v. Humphrey* (1994) 512 U.S. 477.

## DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.

NOT TO BE PUBLISHED

KLATCHKO, J.*

We concur:

ROTHSCHILD, P. J.

WEINGART, J.

---

* Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

34